**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALICE WASHINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 8533** |
| | ) | |
| **OFFICE OF THE STATE** | ) | **Judge Rebecca R. Pallmeyer** |
| **APPELLATE DEFENDER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Alice Washington, an African American woman, had a successful career as a forensic social historian and investigator for Defendant Illinois Office of the State Appellate Defender ("OSAD") until early 2008. At that time, Michael Pelletier was appointed to lead OSAD. Shortly after his arrival, Pelletier concluded that Ms. Washington's employment status was misclassified and reduced her salary accordingly. Plaintiff, who received this news on the day she returned to work following a medical leave, filed an internal grievance challenging the reduction. Four days later, Pelletier called her into his office and demanded her resignation. In this lawsuit, Plaintiff alleges that she had her salary reduced and was eventually forced to resign because of her race and disability, in violation of the Americans with Disabilities Act and Title VII, and in retaliation for the grievance she filed, in violation of Title VII. She includes a claim of race discrimination for an earlier job reassignment as well. OSAD seeks summary judgment on all of these claims. The court concludes the evidence does not support Plaintiff's ADA claim, and grants summary judgment on that claim. Plaintiff's claims of race discrimination related to her salary reduction and forced resignation survive this motion [68]. Her retaliation claim survives too, as further explained below.

**BACKGROUND**

I.      **Plaintiff's Job Responsibilities**

Plaintiff Alice Washington started working at OSAD in 1997; she held the title of Forensic Social Historian ("Social Historian") and was assigned to the Post-Conviction Unit. (Pl.'s Resp. [85] to Def.'s Stat. of Mat. Facts [69], hereinafter "Def.'s 56.1," ¶¶ 1, 3.) The Post-Conviction Unit "handles cases of capital defendants who are appealing their convictions." (First Am. Compl. [30], ¶ 12.) A Social Historian researches a client's past, looking for potential mitigating factors to present at the client's sentencing. The work requires developing and preparing "a client's social history summarizing the significant developmental factors in the client's life and background[.]" (First Am. Compl. ¶ 15.) Eileen McCarthy, Marylynn Kaplan, and Dana Pitts supervised Plaintiff while she worked for the Post-Conviction Unit; Anna Ahronheim was the Deputy Defender for the Post-Conviction Unit during the same time but was not Plaintiff's direct supervisor. (Pl.'s Resp. to Def.'s 56.1 ¶ 4.)

In 2003, Plaintiff was transferred on a temporary basis to the Death Penalty Trial Assistance unit ("DPTA") and worked there, at least initially, as both a Social Historian and Investigator. (*Id.* ¶ 5.) Stephen Richards, Deputy Defender of the DPTA in 2003, and Edward Watkins, Chief Investigator of the DPTA, became Plaintiff's supervisors. (*Id.* ¶ 9.) The DPTA "assists indigent defendants [who] have active on-going trials in which they may be sentenced to death" and represents defendants directly, in addition to "lending assistance to court-appointed private attorneys and private attorneys defending defendants facing the death penalty." (First Am. Compl. ¶ 13.) Unlike a Social Historian, who looks for evidence relevant to sentencing, an Investigator researches a client's case for facts relevant to the client's guilt or innocence. (Pl.'s Resp. to Def.'s 56.1 ¶ 14.)

Plaintiff testified that she worked as both an Investigator and Social Historian in the DPTA in 2003 and continued to perform the functions of both positions up to at least January 1, 2008. (*See* Washington Dep., Ex. 2 to Pl.'s 56.1 [85-2], 18:16–22; 89:14–90:4.) At the time of

her transfer in 2003, Plaintiff was the only Social Historian who was transferred to the DPTA and asked to do Investigation work and was the only DPTA employee who worked there as both an Investigator and Social Historian. (Def.'s Resp. [92] to Pl.'s Add'l Stat. of Mat. Facts [85], hereinafter "Pl.'s 56.1," ¶ 13.)[1] Plaintiff's transfer to the DPTA became permanent on July 16, 2007 (*id.* ¶ 9), and at the same time her job title changed from Social Historian to Investigator. (Pl.'s Resp. to Def.'s 56.1 ¶ 12.) Investigators earn less than Social Historians, but Plaintiff's new supervisor, Deputy Defender Stephen Richards, assured her that her salary would not be reduced as a result of the reassignment. (*Id.*) It was Theodore Gottfried, however, the then-head of OSAD, who had sole authority to set Plaintiff's salary. As discussed below, Gottfried's successor, Michael Pelletier, was "bothered" by Gottfried's decision to allow Plaintiff to keep the higher salary even after she no longer worked as a Social Historian. (*Id.* ¶¶ 15, 37.)

Anna Ahronheim, Deputy Defender of the Post-Conviction Unit, told Plaintiff that the 2003 reassignment happened for two reasons. First, Ahronheim explained that the Post-Conviction Unit no longer had any need for a Social Historian because there was a moratorium on the death penalty in Illinois beginning in 2003. (Pl.'s Resp. to Def.'s 56.1 ¶ 6; Def.'s Resp. to Pl.'s 56.1 ¶¶ 12, 25.) Plaintiff disputes this; she notes that Ahronheim proceeded to rehire or newly hire three Caucasian Social Historians (though it is unclear whether they were assigned to the Post-Conviction Unit): Marylynn Kaplan, Dana Pitts, and Jennifer Parrack. (Def.'s Resp. to Pl.'s 56.1 ¶ 12.) Second, at some point prior to Plaintiff's temporary transfer to the DPTA in 2003, Ahronheim told Plaintiff that Ahronheim wanted all Social Historians to have earned a Master's Degree in Social Work ("MSW"), and as Plaintiff did not have this degree, she no longer qualified for the position. (Pl.'s Resp. to Def.'s 56.1 ¶ 7.) Plaintiff believes Ahronheim

---

[1]    Though the parties agree Plaintiff was the only such employee, the record does not reveal how many Social Historians there were in total at OSAD, or even how many DPTA employees there were in 2003. Exhibit 14 states that as of January 1, 2008, the DPTA employed 27 "individuals" (but does not specify their job titles). Of the 27, there were 14 males (3 African American and 11 Caucasian) and 13 females (5 African American, 2 Hispanic, and 6 Caucasian).

used the MSW requirement as a pretext for discrimination; she asserts that at the time, "Plaintiff was the only African-American FSH and the only FSH without an MSW in her unit." (*Id.*) Pitts and Kaplan both have MSWs, and Parrack has a Masters of Arts in Forensics Psychology. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 71, 75, 78.) In her deposition, Plaintiff testified that she has both a Bachelor's degree and a Master's degree but did not identify the field of study. (*See* Washington Dep., Ex. 2 to Pl.'s 56.1 [85-2], hereinafter "Washington Dep.", 8:15–24.)

## II.     Plaintiff's Cancer Diagnosis and Treatment

In 2004, Plaintiff was diagnosed with breast cancer and went on medical leave for treatment, which included chemotherapy, radiation, and surgery. (Pl.'s Resp. to Def.'s 56.1 ¶ 10.) She returned to work in 2005 and underwent her final chemotherapy treatment in that year, but continued to undergo various other treatments until at least November 2009. (*Id.*; *see* Def.'s Resp. to Pl.'s 56.1 ¶ 32 (citing Washington Dep. at 111:8–9).) The chemotherapy caused plantar fasciitis, resulting in foot pain, and a type of nerve sensitivity known as neuropathy. (Def.'s Resp. to Pl.'s 56.1 ¶ 31.) During Plaintiff's deposition, she responded "no" to the question of whether the breast cancer affected her "job performance or duties in any way." (*See* Washington Dep. at 36:2–4.) Plaintiff submitted a post-deposition affidavit that Defendant argues is inconsistent with this testimony. The affidavit states that "on more than one occasion, [Plaintiff] required leave from work because of [her] breast cancer and its complications and would return to work" when she was again able to perform her job duties. (Washington Aff., Ex. 13 to Pl.'s 56.1 [85-13], ¶¶ 3, 11.) Defendant is correct that a post-deposition affidavit that is inconsistent with deposition testimony may be disregarded; here, however, the affidavit can be harmonized with the testimony. As the court reads the affidavit, it explains that, in addition to Plaintiff's FMLA leave from December 2007 to January 2008, there were other times during her employment when her condition required her to be absent from work—but that when she was not on leave, she remained fully capable of performing her duties.

Plaintiff was on leave pursuant to the Family Medical Leave Act ("FMLA") from December 28, 2007, until January 18, 2008 for surgery related to breast cancer. The record does not reveal the effect this surgery had on her health or on her ability to perform her job duties upon her return. (Def.'s Resp. to Pl.'s 56.1 ¶ 30; Washington Aff., Ex. 13 to Pl.'s 56.1 ¶ 10.) She also asserts that she suffered from neuropathy during her FMLA leave.[2] Pelletier testified that he was aware Plaintiff had taken FMLA leave in December 2007 but was unaware the leave had anything to do with breast cancer. He stated that he had heard she was "going in to loosen some adhesions from a prior surgery" (Def.'s Resp. to Pl.'s 56.1 ¶ 33 (citing Pelletier Dep. Ex. 3 to Pl.'s 56.1 [85-3], 34:17–35:20), but only later learned that the prior surgery was related to breast cancer. (*Id.* (citing Pelletier Dep. at 34:21–36:1).)

### III. Plaintiff's Job Performance, Salary Reduction, Internal Grievance, and Termination

On January 1, 2008, Michael Pelletier became the State Appellate Defender in charge of OSAD, and Susan Carr became OSAD's Director of Support Services. (Pl.'s Resp. to Def.'s 56.1 ¶ 18.) As one of his first acts as OSAD's head, Pelletier ordered an assessment and evaluation of OSAD offices statewide to review the Office's treatment of its employees and clients and to ensure that OSAD's policies were consistent throughout the state. (Def.'s 56.1 ¶ 19.) Pelletier directed Carr to create a questionnaire for support staff employees to complete; the purpose was to learn what sorts of job responsibilities the staff had and whether the staff was fulfilling those responsibilities. (Def.'s 56.1 ¶ 20.) Stephen Richards, Plaintiff's supervisor while she worked at the DPTA, testified that he believes Pelletier had preconceived notions about how to reform the Office: "Frankly, I think [Pelletier] had decided on some personnel changes as foregone conclusion [sic] within maybe a week or two after he took office, if not before." (Richards Dep. Ex. 5 to Pl.'s 56.1 [85-5], 16:24–17:3.) Carr was tasked with

---

[2]     Defendant disputes this, noting that Plaintiff last received chemotherapy—which caused her neuropathy—in 2005. (Def.'s Resp. to Pl.'s 56.1 ¶ 32 (citing Washington Dep. at 32:9–22; 111:8–9).) Again, the court sees no inconsistency; the fact that chemotherapy caused the condition says nothing about how long that condition might persist.

conducting the survey part of the assessment and evaluating the DPTA in Chicago, which took place from January 3, 2008 until January 10, 2008. (Pl.'s Resp. to Def.'s 56.1 ¶ 32.)

On January 3, 2008, while she was still on FMLA leave, Plaintiff returned to the DPTA office to pick up a message related to one of her active cases. Carr was there and spoke with Plaintiff, asking her to complete the employee questionnaire, called the "Needs Assessment – Support Staff Survey," as part of Pelletier's statewide office evaluation initiative. (Pl.'s Resp. to Def.'s 56.1 ¶ 27; Carr Aff., Ex. 2 to Carr Dep., Ex. 6 to Def.'s 56.1 [69-6].) Plaintiff did, though with some hesitation; she told Carr that she was back in the office only briefly, but Carr directed her to fill out the questionnaire as best she could. (Pl.'s Resp. to Def.'s 56.1 ¶ 28.) Curiously, though copies of other respondents' surveys are in the record, the parties have not provided the court with Plaintiff's actual survey responses. Carr claims she reviewed Plaintiff's responses and became "extremely concerned and alarmed that Ms. Washington was unable to identify any amount of time she spent on any given activity." (Carr Aff., Ex. 2 to Carr Dep., Ex. 6 to Def.'s 56.1.) Carr states that Plaintiff told her she couldn't estimate the time spent on each activity because "every day was different." (*Id.*) According to Carr, of 15 survey respondents, "Ms. Washington was the only person who was unable to estimate time consumed by the listed tasks." (*Id.*)

In addition to reviewing Plaintiff's questionnaire responses, Carr reviewed Plaintiff's case files and "spot-reviewed" certain calendar entries from Plaintiff's computer to attempt to account for the work Plaintiff performed on individual cases. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 30–31 (citing Carr Dep. at 63:8–18; 66:13–67:1).) Carr found no record of any work that Plaintiff performed in her capacity as a Social Historian. (Def.'s 56.1 ¶ 31.) Carr also interviewed Plaintiff on January 3, 2008, the day that Plaintiff returned to the office to retrieve messages during her FMLA leave. (Carr Dep. at 35:1–19; Pelletier Dep. at 50:5–22.) In response to questions about the work she performed as an OSAD employee, Plaintiff told Carr that she assisted with mitigation, a job responsibility typically assigned to Social Historians; Carr recorded this information in her

6

interview notes. (Pl.'s Resp. to Def.'s 56.1 ¶ 31.) Carr and Pelletier met to discuss these findings sometime after January 10, 2008. (*Id.* ¶¶ 32–33.)

Plaintiff has submitted the questionnaires completed by other OSAD employees, whom she identifies as comparators: Stephen Barry, William Bruhn, Wendi Liss, Rene Neely, and John Price. As noted, neither she nor Defendant has produced her own questionnaire. In their responses, the other employees do attempt to explain how much time they devoted to each task, though a recurring response from Plaintiff's comparators (with the exception of Mr. Bruhn, who had time estimates for each of his tasks) is that the amount of time that an employee spent on each task "varies" (*see generally* Survey Responses, Ex. 15 to Pl.'s 56.1 [85-15].) Plaintiff explains that to the extent her responses on the questionnaire were cursory, this was a function of the fact that she filled it out while she was on FMLA leave and had returned to the office only briefly to pick up messages; she had planned to complete the questionnaire in more detail when she returned from FMLA leave, but Carr did not follow up with her. (Pl.'s Resp. to Def.'s 56.1 ¶ 29 (citing Carr Dep., Ex. 4 to Pl.'s 56.1 [85-4], 47:11–48:3.) In any event, on this record the court is unable to compare Plaintiff's responses to the survey to those of her colleagues, and so cannot assess whether Plaintiff's responses were similar, relatively less thorough, or otherwise.

Though her own survey responses are not in the record, the record does contain substantial evidence of Plaintiff's satisfactory job performance. For example, Deputy Defender Richards rated her work "very highly," "personally observed" the work Plaintiff did, and testified that it was "absurd" to claim that Plaintiff "was doing no work" for the team. (Def.'s Resp. to Pl.'s 56.1 ¶ 2.) Richards' written performance evaluations of Plaintiff's work support that testimony. For example, her 2007 review calls her "one of the test users of the DPTA calendaring system, and of all of the users, the best at recording her work accurately and completely." (2007 Performance Review, Ex. 2 to Richards Dep. Ex. 5 to Pl.'s 56.1 [85-5].)[3] Richards testified that

_____

[3] Defendant objects to consideration of these performance evaluations on the ground that they are not part of the record. (*See* Def.'s Reply [92] to Pl.'s Resp. to Def.'s 56.1,

he cannot recall any issues concerning Plaintiff's failure to use the DPTA calendaring system to record her work, at least before 2008 when Pelletier became OSAD's chief. (Richards Dep. at 13:22–14:9.) Richards's 2007 review goes on to state that Plaintiff had "outstanding talents as a social forensic historian and investigator" and that she had "unlimited and untiring abilities [that] make her a needed commodity, and an essential asset to this office." (*Id.*)

As additional evidence of her satisfactory job performance, Plaintiff presents the testimony of private attorneys with whom she worked. For example, she worked with Attorney Mark Kusatzky as an Investigator; according to Kusatzky, Plaintiff "never complained about the long hours or time required," "proved to be invaluable," and "did an outstanding job." (Def.'s Resp. to Pl.'s 56.1 ¶ 5 (citing Kusatzky Aff., Ex. 8 to Pl.'s 56.1 [85-8], ¶¶ 7, 8, 10).) Plaintiff worked as an Investigator with attorneys Robert Gevirtz and Debra Seaton and assisted them with mitigation around or after 2006; according to Gevirtz, Plaintiff's job performance "was outstanding," such that "when Ms. Washington was discharged from the State Appellate Defender's Office, we petitioned the court to have her appointed." (*Id.* ¶ 6 (citing Gervirtz Aff., Ex. 9 to Pl.'s 56.1 [85-9], ¶¶ 8, 14).) According to Seaton, Plaintiff worked "up to 12 hours per day," "was highly effective in gaining information," and "working with her was an honor and pleasure." Seaton too, "petitioned the court to have Alice Washington continue with [her] cases" after Plaintiff was discharged. (*Id.* ¶ 7 (citing Seaton Aff., Ex. 10 to Pl.'s 56.1 [85-10], ¶¶ 9–10; 17–18).)

On January 18, 2008, the same day she returned from FMLA leave, Plaintiff received an e-mail message from Tonya Janecek, Director of Human Resources at OSAD. The message announced that Plaintiff's salary would be reduced from $60,000 (the salary of a Social Historian with Plaintiff's years of experience) to $49,400 (the salary of an Investigator with

¶ 3.) It appears these materials were referred to in Richards's deposition and were made an exhibit to that deposition. Plaintiff's failure to include additional copies as exhibits to her Local Rule 56.1 statement is regrettable, but as it appears there is no dispute about their contents, Defendant's objection to the court's consideration of them is overruled.

Plaintiff's years of experience). (Pl.'s Resp. to Def.'s 56.1 ¶ 34, *see* January 18, 2008 E-mail, Ex. H to Washington Dep., Ex. 2 to Def.'s 56.1 [69-2].) Pelletier testified that he placed Plaintiff on an Investigator's pay schedule because Plaintiff had admitted to Carr that Plaintiff was an Investigator, not a Social Historian. That admission prompted Pelletier to review Plaintiff's personnel file, e-mails, and internal memoranda, which confirmed that Plaintiff was an Investigator rather than a Social Historian. (Pl.'s Resp. to Def.'s 56.1 ¶ 35 (citing Pelletier Dep. at 40:16–41:5).) Pelletier said he believed it was "grossly unfair to the other investigators" for Plaintiff to be on a Social Historian pay schedule when she was only an Investigator. (Def.'s 56.1 ¶ 36.)

On January 30, 2008, Plaintiff served OSAD with a formal internal grievance regarding her salary reduction. (Pl.'s Resp. to Def.'s 56.1 ¶ 38.) The grievance stated, in part: "On January 18, 2008, while out of the office on FMLA, after having surgery for a problem occurring from a previous breast cancer operation, I was sent an email pertaining to a cut in salary." (Pl.'s Resp. to Def.'s 56.1 ¶ 39.) Plaintiff further alleged in the grievance that Ahronheim had harassed and discriminated against her by re-hiring two white females, Dana Pitts, and Jennifer Parrack, as Social Historians after Plaintiff was transferred to the DPTA to work as an Investigator. (*Id.*) Pitts and Parrack were hired even though Ahronheim had told Plaintiff no work remained for Social Historians in the Post-Conviction Unit. (Pl.'s Resp. to Def.'s 56.1 ¶ 6; Def.'s Resp. to Pl.'s 56.1 ¶¶ 12, 25.) On February 8, 2008, Pelletier denied Plaintiff's grievance regarding her salary reduction and offered a written explanation. (*Id.* ¶¶ 49–50; Grievance Denial, Ex. J to Washington Dep., Ex. 2 to Def.'s 56.1 [69-2]). Specifically, the denial letter stated that "[i]n the course of reviewing our staff and pay schedules and discussing Susan Carr's evaluations and interviews with the staff at DPTA, I learned that Alice was an Investigator, by her own admission, and yet she was being paid as a Social Historian[.]" (Grievance Denial, Ex. J to Washington Dep., Ex. 2 to Def.'s 56.1 [69-2].)

Four days after Plaintiff submitted her internal grievance (and four days before Pelletier denied it), on February 4, 2008, Pelletier called Plaintiff into his office and gave her the option to resign or be fired; Plaintiff chose to resign so she could retain her health benefits. (Pl.'s Resp. to Def.'s 56.1 ¶ 40; Def.'s Resp. to Pl.'s 56.1 ¶ 10.) Pelletier testified that he made the decision to request Plaintiff's resignation for several reasons. For one, Carr told him that Plaintiff could not explain what her job responsibilities were in the DPTA. (Pl.'s Resp. to Def.'s 56.1 ¶ 41.) Carr told Pelletier that Carr could not find any documentation of work Plaintiff had performed in the DPTA, and in particular that Plaintiff had failed to fill out the "notes" section in the DPTA's calendaring system that would explain what she did in particular cases. (*Id.*) Further, Pelletier pointed out, Plaintiff had not consistently worked eight-hour days as required by OSAD policy. (*Id.*) Pelletier chose not to interview Plaintiff's own supervisors, Richards and Watkins, concerning her work performance, because he "thought that was a waste of time; the other issue is, neither one of those individuals were [sic] credible." (Pl.'s Resp. to Def.'s 56.1 ¶ 51. (citing Pelletier Dep. at 24:2–6; 89:22–91:15).) Notably, Pelletier did interview supervisors of other OSAD employees who had not filled out the notes section in the calendaring system. For instance, he spoke to an attorney to see whether other OSAD employees had in fact performed work on certain cases. (Pelletier Dep. at 88:5–19.) Pelletier reviewed Richards's performance reviews only cursorily; they were "worthless," in his view, because Richards did not have any credibility. (Pelletier Dep. at 33:7–11.) And Pelletier did not speak with any private attorneys Plaintiff may have worked with, either, even though he did so for other OSAD attorneys. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 17, 20.)

Plaintiff contends the reasons Pelletier gave for her forced resignation are pretextual. Plaintiff did in fact receive a memorandum from Deputy Defender Stephen Richards explaining that all DPTA employees were required to complete the notes section in the office's calendaring system, but she testified that Richards told her, either verbally or in writing, that Investigators were not required to do this because the information in the notes section could be subject to

subpoena.  (Pl.'s Resp. to Def.'s 56.1 ¶ 41 (citing Washington Dep. at 82:13–19); Pl.'s Resp. to Def.'s 56.1 ¶ 42.)  In addition to her own testimony, Plaintiff submitted notes from a phone interview that IDHR conducted in the course of its investigation in Plaintiff's claims.  Those notes show that Stephen Richards told the IDHR investigator that "he instructed employees not to record interview details in the calendar system because such details would be discoverable."  (Richards Phone Interview Notes, Ex. 2 to Pelletier Dep., Ex. 3 to Pl.'s 56.1 [85-3].)[4]  Pelletier testified, however, that he was not aware that Richards instructed DPTA employees not to record job details in the calendaring system until this fact came out in the current litigation.  (Pl.'s Resp. to Def.'s 56.1 ¶ 43 (citing Pelletier Dep. at 91:20–92:3).)

Plaintiff was not the only employee that Pelletier fired during the same time period.  Edward Watkins and Fernando Shipley, both African Americans and Investigators in the DPTA, were given the option to resign or be terminated.  (Pl.'s Resp. to Def.'s 56.1 ¶¶ 44–45.)  Steven Berry, Caucasian and Chief Social Historian, was not given the option to resign; according to Pelletier, Berry's conduct was "so outrageous and almost a ghost payroll," so he just fired him.  (Id. ¶ 46 (citing Pelletier Dep. at 84:15–19).)  Anna Ahronheim, Caucasian and Deputy Defender of the Post-Conviction Unit, was given the option to resign or be terminated, and Richards, too, would have been given that option, according to Pelletier, but Richards simply resigned before Pelletier could discuss it with him.  (Id. ¶¶ 47–48.)  Pelletier eventually approved the hiring of two African-American Investigators to replace Plaintiff and Shipley.  (Pl.'s Resp. to Def.'s 56.1 ¶ 53.)

---

[4]    Defendant objects that these notes, like the performance evaluations, are not part of the summary judgment record.  The IDHR notes do not in fact appear in the electronic record, though Plaintiff furnished them to chambers in a courtesy copy set of exhibits.  This practice, and Plaintiff's failure to include these notes in her Rule 56.1 filing, are disappointing.  The court acknowledges, as well, that the investigator's notes are hearsay.  Should she offer them at trial, Plaintiff will be required to lay a satisfactory foundation for admission of the notes, if she can.  The court is willing to consider them at this stage because, again, there appears to be no dispute about their contents, and they appear to bolster Plaintiff's testimony, which is sufficient on its own to create a dispute of fact on her assertion that she was excused from compliance with the calendaring procedure.

Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") against OSAD on January 30, 2008. On February 21, 2008, as Defendant itself admits, Pelletier called Plaintiff's home and told her that he would interfere with her unemployment and make sure Plaintiff never again worked for an agency of the State of Illinois. (Pl.'s Resp. to Def.'s 56.1 ¶ 54) (citing Washington Dep. at 20:12-24:23, 58:18-59:17, IDHR Charge, Ex. B to Wash. Dep.).) Plaintiff testified that, during the phone call, Pelletier told her that IDHR had contacted him about her IDHR complaint. (Washington Dep. at 59:3–17.) Plaintiff did in fact apply to work with other State of Illinois agencies but was not hired. (Pl.'s Resp. to Def.'s 56.1 ¶ 56.)

## IV. Plaintiff's Comparators

Plaintiff identifies several OSAD employees who were not forced out of their jobs despite not filling out the notes section in the calendaring system. William Bruhn and Lonnie Capps, Caucasian Investigators in the DPTA Unit in Springfield, were allowed to keep their jobs after Carr determined that even though they had not filled out the calendar entries, they had completed work on the cases. (Pl.'s Resp. to Def.'s 56.1 ¶ 63.) Edward Torres, a Hispanic Investigator in the Post-Conviction Unit in Chicago and Stephen Spearie, a Caucasian Investigator in the Post-Conviction Unit in Springfield, were also allowed to keep their jobs despite not filling out the notes section correctly. (*Id.* ¶ 64.)

Plaintiff identifies Jennifer Parrack, a Caucasian employed as a Social Historian in the Post-Conviction Unit, as having received more favorable treatment. Parrack was hired by Ahronheim as a Social Historian in June 2007, at a time when Ahronheim had told Plaintiff no Social Historian work was available. (Pl.'s Resp. to Def.'s 56.1 ¶ 69.) Parrack has a Master's Degree in Forensic Psychology. (*Id.* ¶ 71.) Plaintiff identifies Dana Pitts, Caucasian Social Historian assigned to the Post-Conviction Unit, as another person treated more favorably: because Pitts was allowed to quit and return to her position as a Social Historian with no reduction in salary after Plaintiff had been transferred to DPTA. (*Id.* ¶ 72.) Pitts has an MSW

and is a licensed clinical social worker.  (*Id.* ¶ 75.)  Marylynne Kaplan, a Caucasian Social Historian assigned to the Post-Conviction Unit, is also alleged by Plaintiff to have been treated more favorably because while Kaplan was pregnant, she was allowed to work from home with pay and then was allowed to quit and later return at a higher salary.  (*Id.* ¶ 76.)  Kaplan resigned from OSAD on September 13, 2002 as a Social Historian and was rehired on November 16, 2009 as a "mitigation specialist"; neither party has explained the responsibilities of that job or its relationship to the Social Historian or Investigator position.  (Pl.'s Resp. to Def.'s 56.1 ¶ 77.) Kaplan has an MSW.  (*Id.* ¶ 78.)

## V. Procedural History

On March 26, 2008, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and received her right-to-sue letter on July 26, 2012.  (First Am. Compl. ¶ 5.)  In Plaintiff's EEOC charge, she claims that "[o]n July 17, 2007, [she] was demoted to an Investigator.  On January 16, 2008, [she] received a pay-reduction. On March 14, 2008, [she] was discharged."  (Pl.'s Resp. to Def.'s 56.1 ¶ 58.)  The charge further states: "On January 28, 2008, I engaged in a protected activity when I complained to Respondent that I was being treated differently because of my race, sex, and disability."  (EEOC Charge, Ex. 1 to First Am. Compl. [30-1], 2.) Plaintiff filed an initial *pro se* complaint in this court on October 24, 2012 against OSAD and Pelletier in his individual capacity.  (Compl. [1].)  Her amended complaint, filed by counsel on April 30, 2013, is before the court.  Claims asserted against Pelletier in his individual capacity have been dismissed.  (*See* Sept. 12, 2013 Order [44].)  The remaining Defendant, OSAD, now moves for summary judgment on all of Plaintiff's claims.

## DISCUSSION

## I. Summary Judgment Standards

The standards governing this motion are familiar.  The court will grant summary judgment when "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247 (1986).  Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."  *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted).  In ruling on this motion, the court evaluates the evidence "through the summary judgment lens, giving plaintiff the benefit of all conflicts in the evidence and all reasonable inferences that might be drawn from the evidence, without necessarily vouching for their objective accuracy."  *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014).

## II.    Race Discrimination

Title VII makes it unlawful for employers to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1).  Plaintiff has elected to prove her claim of intentional discrimination by the indirect method of proof.  Under that method, Plaintiff proceeds by presenting evidence that (1) she is a member of a protected class; (2) her job performance met OSAD's legitimate expectations; (3) she suffered an adverse employment action; and (4) a similarly-situated individual outside her protected class was treated more favorably. *Swearnigen-El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 860 (7th Cir. 2010).  If Plaintiff makes this showing, then Defendant may counter Plaintiff's *prima facie* case by presenting evidence of legitimate, nondiscriminatory reasons for its actions.  Plaintiff must then demonstrate that Defendant's proffered reasons are pretextual.  *Id.*

In this case, it is undisputed that Plaintiff belongs to a protected class.  The questions for the court, therefore, are whether she suffered an adverse employment action, whether she met OSAD's legitimate job expectations, and whether a similarly-situated employee outside her protected class was treated differently.  The court discusses each element in turn.

## A.    Adverse Employment Actions

Plaintiff identifies three separate adverse employment actions that she claims violate Title VII: (1) her 2007 transfer to the DPTA from the Post-Conviction Unit; (2) her 2008 salary reduction; and (3) Pelletier's February 2008 demand for her resignation.[5]  Defendant admits that the salary reduction and demand that she resign constitute adverse employment actions but disputes that the 2007 transfer qualifies.  To be adverse, "an employment action 'must be a significant change in employment status or a decision causing a significant change in benefits.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (quoting *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007) (ellipsis omitted)).  Plaintiff claims the transfer was adverse because it meant she had to work two jobs (Investigator and Social Historian) even though she was only paid for one.  (Pl.'s Resp. at 5.)  The court disagrees.  Plaintiff testified that in 2007, she was doing investigation and "assisting with mitigation," which is a task a Social Historian normally performs.  (Washington Dep. at 89:14–90:4.)  Even construing the evidence in the light most favorable to her, though, Plaintiff at most can establish that she was given additional job responsibilities and duties, not that she performed two separate jobs.  *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (no adverse employment action where plaintiff was given "additional work that she perceived as outside her normal job responsibilities").  While Plaintiff's salary was not increased to reflect her alleged increased workload, it also was not reduced at the time of transfer.  Simply put, Plaintiff's primary role of Investigator, coupled with certain responsibilities associated with mitigation, did not result in a new position "with

---

[5]    Plaintiff also cites her temporary transfer from the Post-Conviction Unit to the DPTA in 2003 as an adverse employment action.  Assuming that the temporary transfer was an actionable adverse event, any claim arising from it would be time-barred.  *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 921 (7th Cir. 2007) ("Title VII provides that a charge of discriminatory employment practices shall be filed with the EEOC within 300 days 'after the alleged unlawful employment practice occurred.'") (citing 42 U.S.C. § 2000e–5(e)(1)).

significantly different job responsibilities" such that it could be considered an adverse employment action. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

This leaves Plaintiff's salary reduction and her receipt of the offer to resign or be discharged as actionable adverse events.

### B.       Legitimate Job Expectations

Plaintiff's next task in establishing a *prima facie* case of race discrimination is to show that adverse employment actions (salary reduction and termination) occurred despite her meeting OSAD's legitimate job expectations.  To determine whether a plaintiff is meeting an employer's expectations, the court examines the employee's job performance through the eyes of her supervisors at the time of the adverse action.  *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).  In *Gates*, the court found that the employee was not meeting job expectations when she used her employer's phone and Internet for personal use, and the record showed her supervisor's "increasing displeasure" with her job performance that led to her suspension from work.  *Id.*  Similarly, Defendant cites several issues and concerns regarding her work responsibilities and performance that preceded the salary reduction and demand for Plaintiff's resignation.

In determining whether Plaintiff can survive summary judgment on the issue, the court considers the two adverse actions separately.

### i.       Salary Reduction

Defendant argues that the decision to reduce Plaintiff's salary was motivated not by discrimination but by Pelletier's conclusion that Plaintiff should not have been receiving the salary of a Social Historian at all.  Defendant notes that Plaintiff herself admitted that she worked as an Investigator and not as a Social Historian.  (Salary Reduction E-mail, Ex. H to Washington Dep, Ex. 2 to Def.'s 56.1.)  Specifically, Plaintiff admitted that on July 16, 2007, she was transferred to the DPTA on a permanent basis and had her position title changed to Investigator.  (*See* Pl.'s Resp. to Def.'s 56.1 ¶ 12.)   But interpreting that admission as an

acknowledgement that Plaintiff was overpaid ignores her job history. Both parties characterize Plaintiff's transfer in 2003 as "temporary" (*see* Def.'s Resp. to Pl.'s 56.1 ¶ 9), and her then-supervisor assured her that she would not suffer a pay cut. (*See* Pl.'s Resp. to Def.'s 56.1 ¶ 12.) Absent that assurance, Plaintiff might well have challenged the transfer when it first occurred, because it would have constituted a demotion rather than a lateral (and temporary) reassignment. The reassignment became a genuine demotion only in 2008, when it resulted in a substantial reduction in pay. There may well have been a non-discriminatory reason for the 2003 transfer (for example, the MSW requirement, *see* Pl.'s Resp. to Def.'s 56.1 ¶ 7)), but Defendant did not reduce Plaintiff's pay at that time, and instead continued to pay her at the Social Historian rate for four years. In the meantime, Plaintiff asserts, Defendant hired white women to work as Social Historians and presumably could have reassigned her to perform that work rather than continue to (over)pay her as an Investigator. There is no evidence that Pelletier's audit of OSAD resulted in a pay cut for any other employee. Summary judgment on this claim is denied.

### ii.    Demand for Plaintiff's Resignation

The court finds that genuine issues of material fact also preclude summary judgment on the issue of whether Plaintiff was meeting Defendant's legitimate expectations as an Investigator at the time Pelletier demanded her resignation. Plaintiff points to Richards's evaluations, as well as testimonials from attorneys who worked with her, to show that she was meeting and even exceeding job expectations, and that she should not have been terminated. Defendant responds by citing the reasons Pelletier identified for his decision: (1) Plaintiff could not explain her job responsibilities within the DPTA; (2) Plaintiff did not document any work she performed; and (3) Plaintiff's time records revealed that she did not work the required eight-hour work days as required by office policy. (*See* Def.'s 56.1 ¶ 41.) Plaintiff claims Pelletier's reasons were simply a pretext for discrimination against her based on her race and disability. "The pretext inquiry focuses on whether the stated reason for the adverse employment action is

in fact the reason for it—not on whether the stated reason is accurate or fair." *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158–59 (7th Cir. 2014). The court concludes that Plaintiff's evidence is sufficient to generate a dispute of fact on the reasons for her termination.

First, Pelletier admitted in his deposition that he did not speak with Plaintiff's supervisors or any private attorneys with whom she worked to determine what value, if any, she contributed to cases, even though he did this for other employees who, like Plaintiff, failed to document their work in the notes section of the calendaring system. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 17–18 (citing Pelletier Dep. at 87:10–17; 88:23–24; 24:2–6.) Nor did he check case files himself to determine how much Plaintiff was doing. (*Id.* at 26:1–4.) Further, Carr admitted she did not speak with Plaintiff's supervisors or co-workers about Plaintiff's performance and performed only a "spot-review" of Plaintiff's case files, while she may have done a more extensive review of other employees' work. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 30–31 (citing Carr Dep. at 63:8–18; 66:13–67:1); *see* Pelletier Dep. at 89:5–19 ("Even though [Capps and Bruhn] didn't fill out the calendaring system, when [Pelletier and Carr] looked to see what they did on the case, they had files, they had stuff that generated computer and e-mails that indicated that they actually had performed work on those cases.").)

Second, a jury may disbelieve Pelletier's assertion that Plaintiff's failure to make entries in OSAD's electronic calendaring program was a violation of policy. Whatever the office policy may have been, Plaintiff testified that her immediate supervisor, Richards, told her on multiple occasions, both verbally and in writing, not to record case details in the notes section because such notes could be subpoenaed. (Washington Dep. at 82:13–19.) Further evidence in support of this assertion appears in notes from a phone interview that IDHR investigators conducted with Richards. Those notes show that Richards told IDHR that "he instructed employees not to record interview details in the calendar system because such details would be discoverable." (Richards Phone Interview Notes, Ex. 2 to Pelletier Dep., Ex. 3 to Pl.'s 56.1 [85-3].)

Lastly, while Plaintiff's time records might reflect that she worked less than a required eight-hour day, her actual time sheets are not in the record. If other employees similarly did not work the eight-hour day but were not terminated, this fact could be used to show pretext. Disputes of fact preclude summary judgment on this issue, as well.

### C.    Similarly-Situated Employees

The remaining element Plaintiff must establish for her *prima facie* case is that employees outside her protected class who acted in a materially similar matter or who had comparable education, experience, and qualifications were treated more favorably, that is, were not forced to resign. *See, e.g.*, *Crawford v. Indiana Harbor Belt R.R.*, 461 F.3d 844, 846 (7th Cir. 2006) (plaintiff must show "that the members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment").

Plaintiff points to two similarly-situated Caucasian Investigators in the DPTA Springfield office, Lonnie Capps and William Bruhn, who failed to sufficiently document their work in the notes section of the calendaring program but were not discharged; unlike his procedure with respect to Plaintiff, Pelletier followed up on the issue with Capps and Bruhn by speaking to an attorney to see whether Capps and Bruhn had performed work on certain cases. (Pl.'s 56.1 ¶¶ 59, 60, 62, 63; *id.* ¶ 63 (citing Pelletier Dep. at 89:5–19 ("Even though [Capps and Bruhn] didn't fill out the calendaring system, when [Pelletier and Carr] looked to see what they did on the case, they had files, they had stuff that generated computer [sic] and e-mails that indicated that they actually had performed work on those cases.").) Defendant responds by pointing out that Plaintiff's failure to fill out the calendar notes section was not the only reason for the termination decision (Def.'s Reply in Supp. of Summ. Judg. [91], 4.), but the argument is not compelling. The fact that Plaintiff has not distinguished similarly-situated white employees in every particular does not defeat her case. *Cf. Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845 (7th Cir. 2007) (noting that the similarly-situated analysis should not be "unduly rigid" and that the persons do not have to be "'similarly situated' to [plaintiff] in all

pertinent respects"); *Henry v. Jones*, 507 F.3d 558, 564 ("The similarly situated inquiry is a flexible, common-sense one that asks, at bottom, whether 'there are enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" (citing *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007))). And, though Defendant contends Plaintiff failed to work an eight-hour work day on a consistent basis, Defendant has not produced evidence supporting this assertion. Summary judgment is therefore denied on this element, as well.

Defendant argued in its opening brief that Edward Torres and Stephen Spearie were not similarly situated to Plaintiff because they were Investigators in the Post-Conviction Unit in Springfield and were not required by OSAD to make notes in the calendaring program. (*See* Def.'s Mem. at 6.) Defendant also argued that Donald Hopper, Dana Pitts, and Marylynn Kaplan were not similarly situated because unlike Plaintiff, their positions never changed from that of Social Historian to Investigator. (*Id.* at 6–7.) In addition, Hopper and Kaplan resigned to work in the private sector, and because OSAD gives credit for such work experience in determining salary levels if such employees return to work for OSAD, Defendant contends these employees are not appropriate comparators for Plaintiff. (*Id.* at 7.) Lastly, Defendant points out that Kaplan, Pitts, and Parrack all had advanced degrees, a job qualification Ahronheim had adopted for the Social Historian position back in 2003. Defendant argues that Plaintiff failed to respond to the contention that Torres, Spearie, Kaplan, Pitts, and Parrack are not similarly situated. *See Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996) ("Because [plaintiff] did not raise this argument before the district court in response to the summary judgment motion, she has waived this argument."). With respect to Torres and Spearie, the court agrees. Plaintiff did point out, however, on page 6 of her response brief, that though Ahronheim had said no work remained for Social Historians, there were "three new or return hires after Plaintiff's transfer to the DPTA," (Pl.'s Resp. at 6) and argued that the MSW requirement is a pretext.

These arguments are adequate to preserve a claim that Kaplan, Pitts, and Parrack were similarly situated, but received more favorable treatment.

Though Plaintiff has not relied explicitly on the direct method for proving her claim of discrimination, the court notes there is at least a trace of circumstantial evidence of discriminatory animus, as well. It was Richards's impression that "none of the other white employee investigators that [Richards] supervised were let go for poor calendar entries, only the blacks, while all had similar calendar entries." (Pl.'s 56.1 ¶ 16.). Plaintiff refers also to the testimony of Monte Dawson, an African-American hired to replace her. Dawson testified that he "came to find out that [he] was specifically hired to replace the black investigators that had been fired in an effort to offset the filing of any EEO complaints." Dawson also attested to the high quality of Plaintiff's work and files and notes left by her. (Pl.'s 56.1 ¶ 8 (citing Dawson Aff. Ex. 12 to Pl.'s 56.1 [85-12], ¶¶ 8. 10).) Without further foundation, Dawson's impression that he was hired as a cover is inadmissible, but his testimony about the fine quality of her work bolsters Plaintiff's *prima facie* showing that she was meeting all of Defendant's legitimate expectations at the time of her forced resignation.

## III.    Disability Discrimination

Next, Plaintiff claims she was the victim of discrimination on the basis of her disability. To state a claim under the ADA, a plaintiff must first establish that she suffers from a disability within the meaning of the Act. *See Duncan v. State of Wisc. Dep't. of Health and Family Servs.*, 166 F.3d 930, 935 (7th Cir. 1995) ("The first hurdle a plaintiff must pass . . . is the requirement that the plaintiff must be 'disabled.'"). The ADA defines a disability as either "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual, or a "record of such impairment[.]" 42 U.S.C. § 12102(1)(A)–(B). To decide whether an impairment meets the ADA test, a court considers the nature and severity of the impairment, its duration or expected duration, and its permanent or long-term impact or extended impact. *See Serednyi v. Beverly Healthcare, LLC*, 656 F.3d 540, 555 (7th Cir. 2011) (citing 29 C.F.R.

§ 1630.2(j)(2)). If Plaintiff establishes that she is disabled, she may then attempt to prove discrimination under the same rubrics used for Title VII cases. *See Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006) (direct and indirect methods used for both employment discrimination and disability discrimination cases). Plaintiff's disability discrimination fails in this case because, assuming she meets the ADA disability standard, she still cannot show that Defendant discriminated against her *because* of that disability.

First, Plaintiff apart from an unsupported allegation in her IDHR complaint (*see* IDHR Complaint, Ex. B to Washington Dep., Ex. 2 to Def.'s 56.1 [69-2], 3), Plaintiff offers no rebuttal to Pelletier's or Carr's testimony that neither knew she had taken FMLA leave because she had breast cancer. (*See* Carr Dep. at 39:5–15; Pelletier Dep. at 34:17–35:20.) Pelletier testified that he believed Plaintiff was out sick because she was "going in to loosen some adhesions from a prior surgery." (Pelletier Dep. at 34:17–35:20.) He only later learned that her surgery was related to earlier breast cancer treatment. (*Id.* at 34:21–36:1.) And when she returned from FMLA leave, Plaintiff herself testified that the surgery did not affect her job performance. (Pl.'s Resp. to Def.'s 56.1 ¶ 17.) Without establishing that employees of Defendant at the center of this dispute knew she was disabled during the relevant time periods, Plaintiff cannot establish that she had her salary docked or was forced to resign *because* of her disability, rather than for some other reason. *See Timmons*, 469 F.3d at 1129 (affirming district court's grant of summary judgment to employer because plaintiff could not produce "evidence suggesting [the employer's] decision to place him on leave was based on his disability rather than some other job-related reason").

Second, there is no evidence in this case that managers who were aware of Plaintiff's disability took any action against her. She was out on sick leave in 2004 through the beginning of 2005 when the cancer first appeared, and allowed to return to work as soon as she was well. She was granted FMLA leave in December 2007 until January 2008, and put back to work upon her return. To the extent that Plaintiff points to similarly-situated non-disabled employees who

did not have their salary reduced and who were not forced to resign, she has produced no evidence that Defendant's proffered reasons for these other employment decisions demonstrate pretext for her *disability* discrimination claim. *Cf. Timmons*, 469 F.3d at 1129 (noting that the similarly-situated inquiry for disability discrimination claims overlap with the pretext inquiry).

Summary judgment is therefore granted to Defendant on Plaintiff's disability discrimination claim.

## III. Retaliation

Like a discrimination claim, retaliation claims may be established using either the direct or indirect methods of proof. *Alexander*, 739 F.3d at 983. The direct method requires evidence of a causal link between protected activity and an adverse employment action, *see Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)), while the indirect method requires evidence that a similarly-situated employee who did not engage in protected activity was treated more favorably, *see Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011)). Under either of these methods, though, Plaintiff must establish that she engaged in protected activity and that her employer took adverse action against her as a result. For the reasons explained here, the court concludes this claim, too, survives summary judgment.

## A. Statutorily Protected Activity

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e–3(a); *see also* 42 U.S.C. § 12203 (ADA retaliation provision). Filing an official complaint of discrimination with an employer constitutes protected activity when it "indicate[s] that the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

In her formal internal grievance, Plaintiff stated that "[o]n January 18, 2008, while out of the office on FMLA, after having surgery for a problem occurring from a previous breast cancer

operation, I was sent an email pertaining to a cut in salary."  (Pl.'s Resp. to Def.'s 56.1 ¶ 39.)

Defendant claims that Plaintiff's grievance letter does not constitute protected activity because it

did not say that the discrimination occurred because of her alleged disability.  (Def.'s Mem. at

12.); *cf. Tomanovich*, 457 F.3d at 663 ("Merely complaining in general terms of discrimination or

harassment, without indicating a connection to a protected class or providing facts sufficient to

create that inference, is insufficient [to establish that plaintiff engaged in a protected activity

under Title VII].").  In the court's view, Defendant has read Plaintiff's grievance too narrowly.

The grievance letter did refer specifically to breast cancer surgery.  She also made reference to

race discrimination in her statement that "[Ahronheim] . . . began to harass me and discriminate

against me by not posting a position which had become available for chief social historian when

a white female [resigned]."  (*See* Internal Grievance Letter, Ex. I to Washington Dep. [69-2], 1.)

The court concludes the letter constitutes protected activity as a matter of law.

Defendants also argue that Plaintiff should not be allowed to proceed on any claim for

retaliation arising out of race discrimination because her complaint only alleges retaliation in

violation of the ADA.  (*See* Def.'s Reply at 6 (citing First. Am. Compl. ¶¶ 34–42.)  Again, the

court disagrees.  For one, elsewhere in the complaint (though not in the individually pleaded

counts), Plaintiff identifies similarly-situated "non-blacks/non-disabled[s]" who did not engage in

protected activity but were not discharged.  (*See* First Am. Compl. ¶ 31.)  In addition, Plaintiff's

EEOC charge filed on October 24, 2012, stated: "On January 28, 2008, I engaged in a

protected activity when I complained to Respondent that I was being treated differently because

of my race, sex, and disability."  (EEOC Charge, Ex. 1 to First Am. Compl. [30-1], 2.)

Construing Plaintiff's complaint liberally, the court concludes that she has sufficiently alleged a

claim of retaliation based on her complaining of race discrimination in addition to disability

discrimination.  To the extent her complaint does not sufficiently present the race retaliation

claim as a separate count, the court would grant her leave to amend the complaint.  *See* FED. R.

CIV. P. 15(a)(2).

### B. Causal Connection

The final question is whether there is a causal connection between the filing of the grievance and the decision to demand Plaintiff's resignation. "To survive summary judgment on her retaliation claim, [plaintiff] must present sufficient direct or circumstantial evidence for the trier of fact to infer there was a causal link between the protected activity and [the adverse job action]." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010). While the Seventh Circuit has cautioned that "suspicious timing alone is rarely sufficient to create a triable issue," *Tomanovich*, 457 F.3d at 665, elsewhere it has explained that where the temporal proximity between a protected activity and an adverse employment action "occur[s] within days, or at most, weeks of each other," *Mobley v. Allstate Ins. Co.*, 531 F.3d 549 (7th Cir. 2008), a causal nexus may be inferred. This is especially true when the "person who decided to impose the adverse action knew of the protected conduct." *Culver v. Gorman & Co.*, 416 F.3d 540, 545, 546 (7th Cir. 2005) (quoting *Lalvani v. Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001)). In this case, Pelletier did not specifically recall when he received Plaintiff's internal grievance, but the court notes that OSAD time-stamped it as formally received on January 30, 2008, and Pelletier's response form states that he received the grievance February 1, 2008. (*See* Pelletier Dep. at 52:17–55:13; Internal Grievance, Ex. I to Washington Dep; Grievance Response, Ex. J. to Washington Dep.) Four days between Plaintiff's protected activity and the adverse action taken against her, coupled with Pelletier's knowledge of the grievance, is close enough to raise an inference of retaliatory motive. Summary judgment is therefore inappropriate. *See Culver v. Gorman & Co.*, 416 F.3d 540, 545, 546 (7th Cir. 2005) (recognizing that the temporal proximity between plaintiff's complaint and her termination just three days later was "[o]f major significance" in reversing the trial court's grant of summary judgment to the defendant).

Moreover, in this case there is troubling direct evidence that Pelletier is motivated to retaliate against people who make claims. After Plaintiff resigned from OSAD and engaged in another protected activity—filing a complaint with IDHR—Pelletier called her at her home and

threatened to interfere with any effort she might make to seek employment with another state agency. (*See* Def.'s Resp. to Pl.'s 56.1 ¶ 54.) Pelletier's actions post-dating Plaintiff's resignation (and in response to her filing a charge with the Illinois Department of Human Rights) are sufficient to support an inference that the adverse employment action in this case was causally related to Plaintiff's internal grievance. *See Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (noting that "*together with other facts*, [suspicious timing] can sometimes raise an inference of a causal connection.") (emphasis added). Summary judgment on Plaintiff's retaliation claim is denied.

## CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [68] is granted in part and denied in part. The court grants summary judgment in favor of Defendant on Plaintiff's ADA claim. Plaintiff's claim that Defendant discriminated against her on the basis of race in her salary reduction and termination survives this motion, as does her claim that Defendant retaliated against her for her protected activity. A status conference is set for April 1, 2015, at 9:00 a.m.

ENTER:

March 23, 2015

_____
REBECCA R. PALLMEYER
United States District Judge