**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ALICE WASHINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 12 C 8533** |
| | ) | |
| **OFFICE OF THE STATE** | ) | **Judge Rebecca R. Pallmeyer** |
| **APPELLATE DEFENDER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alice Washington, who is African-American, filed this Title VII action against her former employer, the Office of the State Appellate Defender (OSAD), alleging (1) that OSAD discriminated against her on the basis of race in reducing her salary, (2) that she was later forced to resign because of her race, and (3) that her forced resignation was a retaliatory response to an internal grievance she had filed regarding her salary reduction. A jury returned a verdict in favor of Plaintiff on her retaliation claim, but found for Defendant on the remaining claims. The jury awarded $400,000 in compensatory damages. Defendant subsequently filed a motion to reduce that award to $200,000 pursuant to the damages cap under Title VII. [144]

The issue of equitable remedies was left to the court, which held an evidentiary hearing on the issue on December 21, 2015. [170] Both parties filed pre- and post-hearing briefs in support of their positions on equitable relief. (Def.'s Mot. to Reduce Compensatory Damages [144]; Pl.'s Mot. for Equitable Relief [148]; Pl.'s Post-Hearing Mem. [176]; Def.'s Post-Hearing Mem. [179].) For the reasons discussed below, the court reduces Plaintiff's compensatory damages award to $200,000. Washington is entitled back pay, prejudgment interest, front pay, a tax-component award, and compensation for medical expenses, all of which is yet to be determined based on additional information from the parties. The court denies Plaintiff's

requests for compensation related to pension withdrawals and personal loans she accepted from friends and family.

**BACKGROUND**

Washington worked at OSAD from 1997 until she was forced to resign on February 4, 2008. Washington was hired by OSAD as a "mitigation specialist" (a/k/a "forensic social historian") in its post-conviction unit and remained in that position until July 2007, when she was involuntarily transferred to the death penalty trial assistance unit ("DPTA Unit"). Several months later, on January 23, 2008, the newly-appointed State Appellate Defender Michael Pelletier changed Plaintiff's title to "investigator," based on his assessment of her on-the-job responsibilities. (Ex. F to Def.'s Resp. to Pl.'s Mot. for Equitable Relief.) The new title came with a corresponding reduction in pay from $60,400 to $49,400. (*Id.*) Washington responded to her demotion by filing a grievance, claiming that her reduced wages were the result of discrimination against her on the basis of her race and her disability (she was being treated for breast cancer at the time).

Almost immediately, Pelletier took action to end Plaintiff's employment with OSAD: on February 4, 2008, he gave her the option of resigning or being fired. (Ex. B. to Def.'s Resp. to Pl.'s Mot. for Equitable Relief.) Plaintiff resigned on February 4, 2008, effective on March 15, 2008. (*Id.*) On February 8, 2008, Pelletier denied Plaintiff's grievance. (Ex. B to Def.'s Resp. to Pl.'s Mot. for Equitable Relief.)

Plaintiff filed two charges of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") on February 21, 2008. (Ex. A to Def.'s Mot. to Dismiss.) The IDHR issued Plaintiff a "right to sue" letter, and she filed suit in the Circuit Court of Cook County in 2010. That suit was dismissed on sovereign immunity grounds in June 2011, but the EEOC issued Washington a right-to-sue letter in July 2012. (Exs. B & C to Def.'s Mot. to Dismiss.) Washington filed this suit in October 2012. [1]

In the 4.5 years between Plaintiff's resignation and the commencement of this suit, the State of Illinois abolished the death penalty, eliminating the need for the DPTA Unit (which had by then been renamed the Capital Trial Assistance Unit). (Nov. 23 Tr. [143] at 14.) OSAD closed the DPTA Unit on April 15, 2015, while another death-penalty related unit—the Capital Post-Conviction Unit—was eliminated on June 30, 2012. (*Id.*) On April 15, 2011, all but two employees in these units were terminated: one investigator and one mitigation specialist. They completed their units' work and were also let go on June 30, 2012. (*Id.*)

In her suit before this court, Plaintiff alleged that she had her salary reduced and was eventually forced to resign because of her race and disability, in violation of the Americans with Disabilities Act and Title VII, and in retaliation for the grievance she filed, in violation of Title VII. She included a claim of race discrimination for an earlier job reassignment as well. OSAD sought summary judgment [68] on all of these claims. The court granted OSAD's motion [96] with regard to Plaintiff's ADA claim. The remaining claims survived and the parties proceeded to trial. Following a three-day trial, a jury returned a verdict in favor of Plaintiff on only one of the three counts in her complaint: the retaliation claim. The jury awarded Plaintiff $400,000 in compensatory damages. The issue of equitable relief was left to the court.

As for equitable relief, Plaintiff seeks back pay, front pay, prejudgment interest, fringe benefits (in the form of withdrawn pension benefits), compensation for loans she took from friends and family, and reimbursement for medical bills and insurance premiums. Defendant, for its part, asks the court to reduce the jury's compensatory damages award in light of Title VII's statutory cap.

## DISCUSSION

## I.      Title VII Compensatory Damages Cap

The parties disagree about which entity should be considered Washington's "employer" for purposes of Title VII. Defendant argues that Plaintiff was employed by OSAD (Def.'s Mot. to Reduce Compensatory Damages at 1-2), while Washington claims that the State of Illinois was

her "true" employer. (Pl.'s Mot. for Equitable Relief at 2-4.) The distinction is an important one. "Title VII actions must be brought against the 'employer.' In suits against state entities, that term is understood to mean the particular agency or part of the state apparatus that has actual hiring and firing responsibility." *Hearne v. Bd. of Educ.*, 185 F.3d 770, 777 (7th Cir. 1999) (citing *EEOC v. State of Illinois*, 69 F.3d 167, 171-72 (7th Cir. 1995)). And 42 U.S.C. § 1981a(b)(3) caps compensatory damages in Title VII cases based on the number of employees working for the defendant-employer. Defendants having 200-500 employees, such as OSAD[1], face liability of up to $200,000, while awards against larger employers, like the State, max out at $300,000.

Plaintiff argues that, although OSAD is the named defendant in this case, the State of Illinois is the "real party in interest," as "it is the State ultimately that pays the judgment," and OSAD is represented by assistant attorneys general. (Pl.'s Supp. Mot. & Mem. in Support of Max. Cap Under Title VII [153] at 1-2, 5.) Washington points out, as well, that her paychecks came from the State's Comptroller, not OSAD, and her payroll records note her "state service" status. (Ex. A to Pl.'s Supp. Mot.) This is meaningful, she argues, because of the Supreme Court's holding in *Walters v. Metro. Educ. Enters.*, 519 U.S. 202, 206 (1997), that "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll." Citing *Walters*, the Seventh Circuit later described payroll records as the "starting point" for assessing who is employed by a particular employer. *Smith v. Castaways Family Diner*, 453 F.3d 971, 974 (7th Cir. 2006). But *Walters* and *Smith* are far from dispositive here.

In *Walters*, the defendant argued that it did not have enough employees to fall under the purview of Title VII, which applies to an employer that "has fifteen or more employees for each

---

[1] A defendant bears the burden of proof in establishing the number of employees for the purposes of establishing entitlement to a Title VII damages cap. *See Geraty v. Vill. of Antioch*, No. 09 C 6992, 2014 U.S. Dist. LEXIS 158861, at *20 (N.D. Ill. Nov. 7, 2014) (citing *Hernández-Miranda v. Empresas Díaz Massó, Inc.*, 651 F.3d 167, 176 (1st Cir. 2011)). Pelletier testified that, at all relevant times, OSAD employed approximately 300 people. (Trial Tr. Vol. I, at 14.) Plaintiff does not contest this headcount. (Evidentiary Hearing Tr. at 4.)

working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). The defendant, a retail distributor of encyclopedias, had two part-time hourly employees whose schedules required them to work only four days each week. As a result, the parties stipulated that the company had 15 or more employees on its payroll on each working day during 47 weeks, but was actually compensating (including paid leave as compensation) 15 or more employees on each working day during only 9 weeks. *Id.* at 212. The issue in *Walters*, therefore, was "whether an employer 'has' an employee on any working day on which the employer maintains an employment relationship with the employee, or only on working days on which the employee is actually receiving compensation from the employer." *Walters*, 519 U.S. at 204. The Court adopted the first of these interpretations. For purposes of the question presented in *Walters*, the so-called "payroll method" of identifying an employer-employee relationship is particularly helpful, because no one in that case challenged which entity the plaintiff worked for; the only issue was when the plaintiff worked for the defendant. In this case, in contrast, where the issue is whether Plaintiff worked for the State or its agency, payroll records are a good "starting point," but they do not tell the whole story.

Washington also relies on *Robinson v. Sappington*, 351 F.3d 317 (7th Cir. 2003), a case in which the Seventh Circuit ruled that the State of Illinois could be held liable for sexual harassment claims levied against judges who were employed directly by the state but worked at a county circuit court. *Robinson* provides little guidance here because the key question in this case—whether Plaintiff was employed by the state or its agency—was undisputed in *Robinson*: the *Robinson* court noted that there was "no question" that the defendant judges in that case were employees of the state. *Id.* at 331 n.9.

On its face, *Bloom v. Crook*, 78 F. Supp. 2d 1 (D. Me. 1999), also cited by Plaintiff, better supports Washington's position. The plaintiff in *Bloom*, an assistant district attorney, sued the State of Maine over various Title VII violations committed by her supervisor at the district attorney's office. The federal district court in Maine denied the state's motion to dismiss, finding

that the state's modest control[2] over the district attorney's personnel decisions was sufficient to trigger liability as Bloom's employer. *Id.* at 3.

This court nevertheless declines to follow *Bloom.* First*,* the opinion's persuasive weight is minimal as it comes from a district court case from another circuit. More importantly, the *Bloom* court actually highlights the fact that its holding is contrary to Seventh Circuit caselaw: "[the] Seventh Circuit test to determine whether a state or state agency is liable for employment discrimination . . . provides that 'in suits against state entities, [the employer] is understood to mean the particular agency or part of the state apparatus that has actual hiring and firing responsibility.'" *Id.* at 2-3 (quoting *Hearne v. Bd. of Ed. of the City of Chicago*, 185 F.3d 770, 777 (7th Cir. 1999)). The *Bloom* court went on to conclude that the Seventh Circuit's "*Hearne* test [is] too narrow," and adopted an alternative standard. But, unlike a district court in Maine, this court is bound by the rulings of the Seventh Circuit. Plaintiff urges that the so-called *Hearne* test is dicta, (Pl.'s Supp. Mot. at 11), but this court is not alone in its interpretation that the *Hearne* test is controlling in this circuit. *See Golla v. Office of the Chief Judge of Cook County*, No. 11 C 8149, 2012 WL 5463875, at *9 (N.D. Ill. Nov. 8, 2012) ("While there has been explicit criticism of the Seventh Circuit's employer determination in *Hearne* and other cases, that criticism does not release this Court from the binding authority of the Seventh Circuit." (internal citations omitted)); *Bloom*, 78 F. Supp. 2d at 2-3. This court follows the *Hearne* test for establishing whether a state or its agency is the employer in a Title VII case: i.e., the employer is the entity that "has actual hiring and firing responsibility." *Hearne*, 185 F.3d at 777.[3]

---

[2]      Although Maine's district attorneys hire and fire their assistants and set their compensation, those decisions are subject to the approval of the attorney general and the governor. *Bloom*, 78 F. Supp. 2d at 2. Maine's attorney general is also statutorily granted the right to act "in place of or with the district attorneys," in which case the attorney general assumes "all the rights, powers, and privileges" of the district attorney. *Id.* The Illinois General Assembly sets OSAD's budget, but OSAD's personnel decisions are all made in-house. (Dec. 21 Tr. at 12, 15-17.)

[3]      Washington also cites to another out-of-circuit case, *Ferderer v. North Dakota*, 447 F. Supp. 2d 1053 (D.N.D. 2006), which reached a similar conclusion as *Bloom*. In that

Under that standard, there can be no doubt that OSAD was Plaintiff's employer. OSAD has full control over hiring and firing decisions related to its workers. (Evidentiary Hearing Tr. at 15-16.) OSAD employee policies are also set internally. (*Id.* at 17.) And although the state legislature establishes OSAD's budget, OSAD has full discretion to apportion its budgeted funds as it sees fit. (*Id.* at 12.) As OSAD was Plaintiff's employer, the proper cap on compensatory damages under Title VII is $200,000.

## II. Equitable Relief

### A. Legal Standard

Under Title VII, after an employer has been found to have intentionally engaged in an unlawful employment practice, the district court may order back pay, reinstatement, and "any other equitable relief as the court deems appropriate." [4] 42 U.S.C. § 2000e–5(g)(1). Washington seeks back pay, front pay, prejudgment interest, fringe benefits (in the form of withdrawn pension funds), compensation for loans she took from friends and family, and reimbursement for medical bills and insurance premiums.

### B. Back Pay

Back pay represents the wages the plaintiff would have earned had she not been fired, measured from the time of the firing to the date of judgment. *See* 7th Cir. Pattern Civil Jury Instruction 3.11 (2015). District courts have broad equitable discretion to fashion back pay awards to make the Title VII victim whole. *David v. Caterpillar, Inc.*, 324 F.3d 851, 865 (7th Cir.

---

case, the court held that the numerical threshold of Title VII was enacted to "spare very small businesses from Title VII liability," while such concerns do not apply to "individual offices and departments within a state's executive branch[,] given the resources that the offices and departments have to draw upon." *Id.* at 1071. That court went on to express concern that "applying the numerical threshold to individual offices and departments would be a significant loophole . . . . For example, it is doubtful whether the governor's office in North Dakota would meet the fifteen-person threshold." *Id.* Salient as those conclusions may be, they do not undo the Seventh Circuit's holding in *Hearne*.

[4] The cap on compensatory damages in Title VII cases does not apply to equitable relief. 42 U.S.C. 1981a(b)(2).

2003).  Where a jury finds unlawful retaliation in violation of Title VII, "there [i]s a strong presumption that [the plaintiff is] entitled to a back pay award on the basis of what she would have earned absent the discrimination."  *Id.*  "Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts."  *Hutchison v. Amateur Elec. Supply*, 42 F.3d 1037, 1044 (7th Cir. 1994).

The parties differ on three key factors in the back pay calculation: (1) Washington's salary in the years after her resignation; (2) the time period during which Washington is owed back pay; and (3) whether her back pay should be reduced by Plaintiff's earnings during the period of her back pay award.

### 1. *Washington was an investigator at the time of her resignation*

Plaintiff argues that her back pay award should be calculated based on the pay scale for mitigation specialists.  (Pl.'s Mot. for Equitable Relief at 4-5.)  Mitigation specialists of Washington's tenure (15 years as of 2008) earned $60,400 per year at the time of her resignation.  (FY 2007 OSAD Pay Schedule, Ex. O to Def.'s Resp. to Pl.'s Mot. for Equitable Relief, at 19.)  But Plaintiff was not making $60,400 at the time she resigned.  Shortly before Plaintiff left OSAD, Pelletier reduced her salary to $49,400 to reflect the fact that, according to him, Washington was in fact performing the duties of an investigator and not a mitigation specialist.  (Pl.'s Personnel Records, Ex. F to Def.'s Resp. to Mot. for Equitable Relief.)  Plaintiff's final day on OSAD payroll and insurance was March 15, 2008.  Washington contends that the court should disregard that reduction in her salary in light of the jury's verdict:

> OSAD reduced Washington's pay shortly before her termination. In response, Washington filed a grievance. The jury found OSAD terminated Washington for filing that grievance, but OSAD also proceeded to deny her grievance as moot. Had OSAD not unlawfully terminated Washington, her grievance would have been adjudicated. Because OSAD's retaliation denied Washington this process, OSAD should not benefit from its unlawful conduct, and Washington should be paid as a Forensic Social Historian.

8

(Pl.'s Post-Hearing Mem. at 8.)

The court disagrees. The jury found that Washington's forced resignation was retaliatory, but it found for OSAD on Plaintiff's salary reduction claim. Contrary to Plaintiff's assertion that Pelletier denied her grievance as moot, the record indicates that he denied the grievance on its merits. (Ex. B. to Def.'s Post Hearing Mem.) The starting point for the court's back pay calculations is the pay scale associated with mitigation specialists.

### 2. *Plaintiff is entitled to back pay through the verdict*

The next point of contention is the time period during which Plaintiff is entitled to back pay. OSAD argues that, regardless of discrimination, Washington would have been out of a job as of April 15, 2011, the date on which the DPTA Unit shut down. (Def.'s Post-Hearing Mem. at 3.) If this is true, Plaintiff's back pay award would also cease on that date. *See David*, 324 F.3d 865 (holding that back pay awards should reflect the amount that the plaintiff "would have earned absent the discrimination"). Washington contends, however, that her back pay should be calculated through the date of the verdict. (Pl.'s Post-Hearing Mem. at 2.) Although the DPTA Unit shut down in 2011, she points to six other OSAD employees whom she claims were similarly situated and got new jobs at OSAD or "transferred" to another state agency: Ann Carlson, Charles Hoffman, Jennifer Parrack, John Price, Angelica Zambrano, and Paulette Williams. (*Id.* at 3.)

Two of Plaintiff's supposed comparators are clearly poor fits. Ann Carlson and Charles Hoffman are both lawyers who now work on appeals at OSAD. Carlson was a member of the Capital Post-Conviction Unit until its elimination in 2012. (Dec. 21 Tr. at 8-9.) Hoffman worked in the Supreme Court Unit, which was eliminated in 2011. (*Id.* at 7-8.) The fact that these lawyers continued at OSAD after the death-penalty-related unit closures is largely irrelevant for Plaintiff, a non-lawyer.

Parrack and Price, like Washington, are both former mitigation specialists who were part of the disbanded death penalty units. Based on state payroll data, Plaintiff asserts that both of these individuals are currently state employees outside of OSAD: "Price is currently employed with the Illinois State Police and Parrack, as Washington testified, is employed at the Illinois Parole Board." (Pl.'s Post-Hearing Mem. at 3.) Washington further claims, without explanation, that Price and Parrack "were likely transferred" to their current state agencies. (*Id.*) But affidavits[5] from the two former OSAD employees themselves rebut that assertion.

Parrack's affidavit clarifies that she held a position on the Illinois Prisoner Review Board (PBR) from August 2011 to March 2015. (Parrack Aff., Ex. J to Pl.'s Post-Hearing Mem., ¶¶ 5-6.) To be appointed to the PBR, she applied for the position, "interviewed extensively," was appointed by the governor, and finally confirmed by the Illinois Senate. (*Id.* ¶ 5.) She is now a reentry coordinator with the Illinois Department of Corrections, a position she received after applying and interviewing in response to a statewide posting. (*Id.* ¶ 8.) According to Parrack, OSAD "did not transfer, relocate, or reassign [her] to any other state agency after [her] employment with OSAD ended." (*Id.* ¶ 10.) Her statements are consistent with Pelletier's testimony and the affidavit of Theodore Gottfried, Pelletier's predecessor as State Appellate Defender. Both men stated that they had no power to transfer or relocate any OSAD employees (or former employees) to positions in other state agencies. (Gottfried Aff., Ex. I to Pl.'s Post-Hearing Mem., ¶ 10; Dec. 21 Tr. at 18.) OSAD's Chief Fiscal Officer ("CFO") Tonya Janecek similarly testified that Parrack was not transferred or reassigned to another state agency by OSAD. (Dec. 21 Tr. at 34.)

---

[5] Washington asks the court to disregard the affidavits as untimely because, although "Washington asked OSAD to provide any documents . . . it planned on calling at the [December 21] hearing by close of business [on December 17]," OSAD did not file them until December 18. (Pl.'s Post-Hearing Mem. at 6.) As the affidavits were still filed several days in advance of the December 21, 2015 hearing on equitable relief, Washington's objection is overruled. (Exs. J & K to Def.'s Post-Hearing Mem., filed Dec. 18, 2015.)

As for John Price, it seems that Plaintiff has fallen victim to a case of mistaken identity. State payroll records contain several entries for persons with the name of John Price, but the John Price who once was employed by OSAD currently works for a private healthcare company. (Price Aff., Ex. K to Pl.'s Post-Hearing Mem. ¶ 7.)  In fact, after leaving OSAD on April 15, 2011, this John Price "was never employed by . . . any other State of Illinois agency."  (*Id.* ¶ 8.)

Two of Washington's alleged peers do remain employed, however:  Williams and Zambrano.  Both worked in units eliminated by OSAD in 2011 and 2012.  (Dec. 21 Tr. at 29-30.) Zambrano served as a paralegal with the Capital Trial Assistance Unit until it and her position were eliminated on April 15, 2011.  (Dec. 21 Tr. at 29.)  Later, on a date not specified in the record, she joined the First District OSAD office as a docket clerk.  (*Id.*)  Williams, meanwhile, was a legal secretary in the Capital Post-Conviction Unit until it closed in June 2012.  (*Id.* at 30.) She too now works as a docket clerk in the First District office.  (*Id.*)

According to OSAD, Williams and Zambrano "are [not] valid comparators as they are not investigators, they held positions that still exist at OSAD, and therefore their skills could be transferred to other areas of OSAD."  (Def.'s Post-Hearing Mem. at 5.)  OSAD also points out that "Plaintiff has not presented any evidence that her skills as an investigator at the trial level would somehow translate to that of a docket clerk for appeals[; and] Plaintiff did not testify that she applied for any of these positions at OSAD."  (*Id.* at 6.)

OSAD's arguments have some force, but the court is ultimately not persuaded.  That Williams and Zambrano previously held positions that "still exist at OSAD" is irrelevant, given that both took on new positions in that agency when they became employed in the First District. For the same reason, the fact that Plaintiff previously held a different job (investigator) than Williams and Zambrano (legal secretary and paralegal, respectively) is immaterial.  The purpose of back pay is to make Plaintiff whole.  The relevant question, therefore, is whether Plaintiff could have continued her employment with OSAD or the state after her unit shut down in April 2011.  Zambrano's story, in particular, suggests that Washington could have returned to OSAD

as a docket clerk shortly after her unit was terminated. Zambrano, like Plaintiff, is trained as a paralegal (Dec. 21 Tr. at 50), and worked at the trial level while the death penalty units were extant.

OSAD's other critique—that Washington "did not testify that she applied for [a docket clerk position] at OSAD" (Def.'s Post-Hearing Mem. at 6)—is similarly unavailing in light of the dearth of evidence that the jobs were ever publicly posted in the first place. OSAD did not offer affidavits from either Williams or Zambrano, nor did either testify during the evidentiary hearing before the court. Instead, OSAD relied exclusively on the testimony of CFO Janecek. But Janecek had no personal knowledge of how either Williams or Zambrano landed new jobs at the First District office. She testified that the two women applied, interviewed, and were rehired for their current positions, but later acknowledged that she had no involvement in the hiring process at the district level. (Dec. 21 Tr. at 29-30, 38.) Specifically, she could not say whether any preference was given to Williams and Zambrano because of their standing as laid-off OSAD employees. (*Id.* at 38.)

The question of whether Washington would have remained in OSAD's employ beyond the closing of the DPTA Unit in April 2011 is a close one. Ultimately, the burden falls on OSAD to establish that Washington would not have rejoined OSAD in some capacity—for example, that of docket clerk, the position held by Zambrano and Williams—had she not been unlawfully terminated. *Hutchison*, 42 F.3d at 1044 ("Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were in fact less than the plaintiff asserts.") OSAD has failed to meet that burden.

Washington is therefore entitled to back pay at the investigator pay scale from March 15, 2008 (her last day on OSAD's payroll) through the closure of her former OSAD unit on April 15, 2011. Thereafter, back pay must be calculated at the docket clerk level, as no investigator

positions existed at OSAD after that date and no OSAD investigators received similar positions elsewhere.  (Nov. 23 Tr. at 14-15.)

### 3.  *Back pay calculations*

The record contains the investigator pay schedules for fiscal years 2007 and 2009 (effective November 1, 2006 and November 1, 2008, respectively).  (Ex. O to Def.'s Resp. to Pl.'s Mot. for Equitable Relief, at 8, 19.)  OSAD never again increased the investigator pay schedule.  (Dec. 21 Tr. at 32.)  As an investigator, Washington also would have received a $780 "anniversary raise" on her anniversary dates in 2009 and 2010 (roughly the beginning of the calendar year).  (Nov. 23 Tr. at 21; Dec. 21 Tr. at 33.)

The record also includes the docket clerk pay schedule for fiscal years 2007 and 2009. (Ex. O to Def.'s Resp. to Pl.'s Mot. for Equitable Relief at 8, 18.)  There is no evidence, however, of how (or whether) that pay schedule changed after 2009.  The court, therefore, will assume (a) that docket clerks received the same anniversary raise as investigators, and (b) that docket clerk salaries continued to increase at the rate reflected in the 2007 to 2009 time period (i.e., approximately 1.7% every two years, effective November 1 of every even year[6]).  Because this order rests on assumptions, the court will allow either side to show cause why the court's assumptions and math misrepresent what Washington would have earned from 2008 to 2015.

A final piece of the puzzle remains.  None of the non-lawyers in the death-penalty units experienced uninterrupted employment at OSAD.  Both Williams and Zambrano were out of work for a period of time prior to joining the First District.  Zambrano provides the most apt point of comparison, having lost her job on the same date that Washington's unit disbanded: April 15, 2011.  Although Zambrano's next start date does not appear in the record, Pelletier testified that

---

[6]      Docket clerks with 15 years of experience made $45,150 in 2009 compared to $44,400 in 2007.  (Ex. O to Def.'s Resp. to Pl.'s Mot. for Equitable Relief at 8, 18.)  At that rate, the salary would have increased to $45,913 for fiscal year 2011, $46,688 for fiscal year 2013, and $47,477 for fiscal year 2015.  In addition to those figures, Washington would have received an extra $780 for each year of service beyond 2008.

she was between jobs for approximately three months before starting with the First District. (Dec. 21 Tr. at 25.) The court will assume that Washington likewise would have been unemployed until mid-July 2011.

Based on these calculations, Washington is entitled to a back pay award of $377,569[7], subject to the additional factors addressed below.

### 4. Washington's back pay award must be reduced by her earnings during the back-pay period and the amount that would have been withheld for health insurance premiums

"The award of back pay must be reduced by the amount of any income from employment earned by complainants during the period covered by the back pay award [under] Title VII." *Gaffney v. Riverboat Servs.*, 451 F.3d 424, 462 (7th Cir. 2006) (internal quotation marks omitted). OSAD argues that Washington's back pay award should also be reduced by $112,551.90, the amount of wages she earned after her resignation and before the DPTA Unit shuttered in April 2011. (Def.'s Hearing Mem. at 10.) Washington has not challenged Defendant's assessment of her earnings during this period.[8] But the record is silent regarding

---

7

| Start date | End date | Job title | Salary | % of year | Earnings | Notes |
|---|---|---|---|---|---|---|
| 3/16/2008 | 10/31/2008 | Investigator | $ 49,400 | 62.84% | $ 31,044 | |
| 11/1/2008 | 12/31/2008 | Investigator | $ 50,150 | 16.67% | $ 8,358 | FY 2009 Pay Schedule |
| 1/1/2009 | 12/31/2009 | Investigator | $ 50,930 | 100.00% | $ 50,930 | Anniversary raise |
| 1/1/2010 | 12/31/2010 | Investigator | $ 51,710 | 100.00% | $ 51,710 | Anniversary raise |
| 1/1/2011 | 4/15/2011 | Investigator | $ 52,490 | 28.77% | $ 15,100 | Anniversary raise |
| 4/16/2011 | 7/14/2011 | Unemployed | $ - | 24.66% | $ - | Unemployment |
| 7/15/2011 | 12/31/2011 | Docket clerk | $ 48,253 | 46.58% | $ 22,474 | Rehired |
| 1/1/2012 | 10/31/2012 | Docket clerk | $ 49,033 | 83.33% | $ 40,861 | Anniversary raise |
| 11/1/2012 | 12/31/2012 | Docket clerk | $ 49,808 | 16.67% | $ 8,301 | FY 2013 Pay Schedule |
| 1/1/2013 | 12/31/2013 | Docket clerk | $ 50,588 | 100.00% | $ 50,588 | Anniversary raise |
| 1/1/2014 | 10/30/2014 | Docket clerk | $ 51,368 | 83.01% | $ 42,643 | Anniversary raise |
| 10/31/2014 | 12/31/2014 | Docket clerk | $ 52,157 | 16.99% | $ 8,860 | FY 2015 Pay Schedule |
| 1/1/2015 | 11/18/2015 | Docket clerk | $ 52,937 | 88.22% | $ 46,700 | Anniversary raise |

| | | | | | Grand total: | $ 377,569 |

8    The court notes, however, that OSAD made this argument explicit for the first time in its most recent filing, a memorandum responding to Plaintiff's post-hearing memorandum. If Washington disputes OSAD's calculation of her earnings from March 16, 2008 to April 15, 2011, she may raise any such objections when she files her most recent tax records

Plaintiff's earnings from 2012-15. Information concerning Plaintiff's income during this period is necessary to properly calculate her back pay award. Washington is ordered to file her income tax returns for these years within 21 days of this order.

The parties are silent on another important factor in calculating Washington's back pay: the amount that would have been withheld from her salary to pay for her health insurance premiums. Both OSAD and Washington refer to investigator and mitigation specialist salaries without reference to these costs. OSAD is ordered to file documentation regarding employee health insurance costs from 2008 to present within 21 days of this order.

### C.     Fringe benefits

Washington also seeks an additional $20,494.78 in lost fringe benefits. This sum represents the pension funds she was "forced to withdraw . . . to support herself after her termination." (Pl.'s Post-Hearing Mem. at 12.) But the appropriate remedy for this loss is back pay. To award lost wages *and* compensate Plaintiff for funds she used to offset the loss of those wages would amount to a windfall in Washington's favor.[9]

### D.     Pre-judgment interest

Plaintiff requests pre-judgment interest. Parties who prevail on their Title VII or Title IX retaliation claims are entitled to prejudgment interest on their back pay award. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 757 (7th Cir. 2002). When calculating prejudgment interest, the Seventh Circuit directs courts to use the prime rate. *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). More specifically, this court (and others) has utilized the average prime rate to award prejudgment interest to plaintiffs in Title VII cases. *See Hathawa v. New Dimension Ctr. for Cosmetic Surgery*, No. 03 C 5848, 2006 WL 1594060, at *5 (N.D. Ill.

---

with the court.

[9]     Plaintiff also seeks to recover $49,707.40 in loans she took from friends, family, and private lenders. (Ex. 9 to Pl.'s Post-Hearing Mem.) As the court noted during its November 23, 2015 hearing, "salary recovery is the appropriate compensation" for any loans taken out as a result of Washington's lack of a salary during this period. (Nov. 23 Tr. at 32-33.)

June 6, 2006); *Staples v. Parkview Hosp., Inc.*, No. 1:07-CV-327, 2010 WL 780204, at *11 (N.D. Ind. Mar. 3, 2010); *Armstrong v. Charlotte County Bd. of County Commissioners*, 273 F. Supp. 2d 1312, 1321 (M.D. Fla. 2003) (utilizing IRS prime rate for prejudgment interest in Title VII case). The court will award prejudgment interest on the back pay award at a rate of 3.4172%[10], compounded monthly from March 15, 2008 to the date of judgment.

### E.    Tax-component award

Finally, Washington seeks a tax-component award to offset the increased tax burden she will incur as a result of receiving her back pay in a lump sum. The Seventh Circuit, joining other circuits, recently endorsed such an offset in discrimination cases. *E.E.O.C. v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme.").

The record contains Plaintiff's tax records for 2008-2012. (Ex. P to Def.'s Resp. to Pl.'s Mot. for Equitable Relief.)   But in order to calculate the increased tax burden that she will suffer as a result of the lump-sum award, the court requires three additional pieces of information: (a) what Washington would have paid in taxes had she worked as an investigator from March 15, 2008 to April 15, 2011 and a docket clerk from July 15, 2011 to the date of the judgment; (b) what Washington actually paid in taxes each of those years; and (c) what income Washington (and her husband, if filing jointly) expects to earn in 2016.[11]

---

[10]    This is the average of the prime rates between March 2008 and November 2015. *See* Board of Governors, Federal Reserve System, *Historical Data, Selected Interest Rates,* http://www.federalreserve.gov/releases/h15/data.htm (last visited Dec. 15, 2015) (download spreadsheet for "Bank prime loan" at hyperlink for "monthly" data).

[11]    Plaintiff's tax-component award will be calculated as follows: [(Washington's tax burden had she remained at OSAD from 2008-2015) – (Washington's actual tax burden from 2008-2015)] + [(Washington's 2016 tax burden with the lump sum payment) – (Washington's 2016 tax burden without the lump sum payment)].

### F. Front Pay

Washington also seeks front pay. Front pay represents the wages the plaintiff would have earned had she not been fired measured from the date of the judgment to some reasonable point in the future. *See McKnight v. GMC*, 908 F.2d 104, 116 (7th Cir. 1990). The award "must be grounded in available facts, acceptable to a reasonable person[,] and not highly speculative." *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994). "The familiar common law duty of mitigating damages is imposed: the employee must make a diligent search for comparable employment." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 771 (7th Cir. 2006) (noting that it is the employee's responsibility to "present persuasive evidence of inability to find a substitute job").

Washington seeks eight years of front pay, which would bring her to the current Social Security retirement age of 66. (Pl.'s Mot. for Equitable Relief at 11.) Although one could conceivably argue that such an award is inappropriate because it is "unduly speculative," *McKnight*, 973 F.2d at 1372, or too lengthy, *EEOC v. HBE Corp.*, 135 F.3d 543, 555 (8th Cir. 1998) (holding five years front pay was too long for employees who had worked for the defendant for nineteen months or less), or that Washington has a "reasonable prospect of obtaining comparable employment," *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir. 1986), the State offers a lone objection: namely, that Plaintiff "cannot have expected to work at OSAD past April 15, 2011 . . . [because] all investigator positions . . . were eliminated on [that date]." (Def.'s Resp. to Pl.'s Mot. for Equitable Relief at 9-10.) But, as explained above, the court has rejected that argument. Despite her efforts to find comparable employment, Washington has failed to do so, earning less than her OSAD salary in every year since she resigned. (Ex. P to Def.'s Resp. to Pl.'s Mot. for Equitable Relief.)

As Defendant's sole objection to front pay lacks merit, the court will award Washington front pay through her 66th birthday. Because front pay is designed to plaintiffs "in the identical financial position [they] would have occupied had [they] been reinstated," Washington has a

duty to mitigate her damages.  *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995).  Although Plaintiff has not found a comparable job, she has earned a significant amount of money in each of the years for which data is available in the record.  She is therefore entitled to front pay equal to the amount required to make her "whole."  The award will equal the amount she would have earned at OSAD through 2023, minus Plaintiff's average annual income from the years 2009-2015.[12]

### G.     Medical expenses and insurance premiums

Finally, Plaintiff seeks to recover medical expenses as well as her out-of-pocket payments toward health insurance incurred following her resignation from OSAD.   In total, Washington requests $150,569.91 in medical expenses and $38,095.17 in insurance premiums. (Pl.'s Post-Hearing Mem. at 11; Ex. 9 to Pl.'s Post-Hearing Mem.)   OSAD objects to both totals.

### 1.     Medical expenses

Regarding Plaintiff's medical expenses, OSAD argues that Washington has failed to show that she incurred the vast majority of the total she claims.  According to OSAD, "Plaintiff's actual medical bills show that the medical charges were adjusted, covered by insurance, discounted, provided for free, or written off as bad debt by the provider."  (Def.'s Post-Hearing Mem. at 14.)

The bulk of Washington's alleged medical expenses come from cancer treatment she received at Northwestern Memorial Hospital from January 2008 through October 2013.  (Ex. 9 to Pl.'s Post-Hearing Mem. at 1.)   But the documentation provided by Plaintiff does not show that she was ever actually charged (or paid) a dime for these services.  Almost all of the $132,241.74 in medical bills from this period is covered by "adjustments" to the invoices.  These adjustments come in various forms, such as "FREE CARE," "100% FULL DOC FREE CARE," "UNINSURED DISCOUNT ADJ," and "FREE CARE EXTERNAL VENDOR."  (Medical Bills, Ex.

---

[12]     This calculation requires Washington's tax return information for 2013-2015, which the court has already requested above.

D to Def.'s Resp. to Pl.'s Mot. for Equitable Relief at 2-106.)  The only "payments" listed are apparent references to Plaintiff's COBRA coverage ("ST OF ILL PPO GRP HLTH") and to something called "MANAGED CARE."  None of the payments appear to be from Plaintiff herself. And nothing in the invoices suggests that Washington currently owes anything for these services.  To the contrary, each entry contains a line item for "ACCT BAL TO DATE," which reads ".00."  (*See, e.g.*, Medical Bills at 27.)

Washington has explained that she plans to compensate Northwestern for her care regardless of any legal obligation to do so.  At the evidentiary hearing, Washington testified that Northwestern treated her under a program called "Financial Care" that allows uninsured individuals to continue to receive healthcare:

> Since I was being treated at Northwestern for cancer, I explained to them the situation after I had gotten terminated from the job. And between that and me getting insurance, I explained to them that, because I had the cancer and was being treated there, that I wanted to continue with my medical care there.
>
> So they explained to me about this financial care program, which allowed me to continue the medical care because I didn't have a means of income or health insurance.  And I explained to them that I had, in fact -- was in the process of trying to litigate the situation with the job. And hopefully when I win the litigation or however it turned out, that I would put the money back into the fund, because the fund is set up for people that don't have any insurance or any means of paying.
>
> So their position is, if you can replace the money or contribute some monies back toward the fund, that would be in there for the next person that came along that was in the same situation. . . . [W]hile Northwestern isn't actively pursuing the debt right now, it's still money owed.

(Dec. 21 Tr. at 46-48.)  Based on this testimony, Washington contends that she "owe[s $132,241.74] to Northwestern Hospital's Financial Care Program."  (Pl.'s Post-Hearing Mem. at 11.)

It is undisputed that Northwestern is not seeking payment from Plaintiff.  That choice is surely informed by the fact that, in almost every instance, an uninsured, out-of-work individual is unable to pay $130,000 in medical bills.  But there is no such thing as a free lunch, nor is medical care provided for free.  The hospital ended up footing the bill for Washington's care

because she had lost her job.  Had Plaintiff remained employed, her health insurance would have covered her care, and Northwestern would have been paid.  Instead, Northwestern has absorbed the cost of providing care for her.  Northwestern's failure to issue a bill to an unemployed and apparently indigent person does not, in the court's view, justify excusing OSAD from paying all of the costs associated with Plaintiff's unlawful discriminatory termination.  OSAD must pay for Washington's treatment.  The court expects Plaintiff to confirm that any eventual award related to the reimbursement of these medical expenses will flow to Northwestern, not to Plaintiff herself, as Washington did not pay for her treatment, nor does she owe anything for it now.

On this issue, as well, however, the record remains incomplete.  Plaintiff has provided over 100 pages of invoices related to her care at Northwestern Memorial Hospital, but the costs of her treatment on the invoices are subject to myriad "adjustments," such that the court cannot determine what costs would actually have been passed on to Plaintiff or to her insurer.  Furthermore, each page of each bill contains the noting that, "THIS BILL MAY NOT REFLECT YOUR FINAL CHARGES."  (Medical Bills at 2-106.)  Washington is therefore ordered to obtain and submit, within 21 days, evidence of what Northwestern Memorial Hospital would have charged for the treatment she received from the last day of her COBRA coverage (August 31, 2008) through October 2013.

The remainder of Plaintiff's alleged medical expenses are plagued with discrepancies.  Several of the bills she points to are duplicative.  (*Compare id.* at 126 & 145; 122-25 & 162; 146 & 151.)  Others claim costs in excess of what she owes and/or paid.  (*Compare id.* at 108-109 & Ex. 9 to Pl.'s Post-Hearing Mem. (claiming $4,092.29 in costs, when costs were actually $938.51 and adjustments accounted for the remaining $3,153.78 of the bill).  Even Plaintiff has now conceded that $21,891.15 of the medical expenses she initially claimed were either incurred while she was still covered by OSAD group insurance or non-compensable because

they involve one of her children who would have aged out of Washington's insurance coverage by the time of treatment. (Pl.'s Post-Hearing Mem. at 11.)

Exclusive of the Northwestern hospital bills discussed above, the court's analysis of Washington's medical bills reveals that Plaintiff has either paid or owes $13,869.90[13] for healthcare expenses that she would not have incurred had she remained employed. She is entitled to an award of 80% of this total—$11,095.92—as she would have been on the hook for 20% of her bills under the OSAD insurance policy. (Nov. 23 Tr. at 12.)

### 2. *Insurance premiums*

As for the insurance premiums, OSAD again argues that Washington has failed to substantiate her claimed expenses. The court largely agrees. Washington claims that she paid the following insurance premiums: Silverscript, $167.40; COBRA (11 months at $1,722.97), $18,952.67; life insurance, $18,600, and AARP Medicare (11 months at $34.10), $375.10. (Ex. 9 to Pl.'s Post-Hearing Mem.) Yet, few of these premiums are supported by the record.

The court has identified evidence of the following insurance premium payments: $167.40 for Silverscript (Medical Bills at 167-69); $34.10 for AARP Medicare in May 2015 (*id.* at 170); and $1,722.97 for COBRA in August 2008. There is no proof that Plaintiff ever purchased life insurance. Neither the AARP receipt nor the COBRA receipt corroborates Plaintiff's claim that she paid for 11 months of each coverage. To the contrary, Plaintiff's payroll records indicate that she purchased COBRA coverage immediately following the effective date of her resignation (March 15, 2008), but that coverage terminated on September 1, 2008 due to "Non

---

13

| Provider | Amount owed/paid | Ex. D Pg. # |
|---|---|---|
| American Back Center | $ 3,738.51 | 108-11 |
| Profession Eye Center | $ 1,085.90 | 112-21 |
| NW Memorial Hospital | $ 663.99 | 122-26 |
| Dr. Williamson | $ 7,701.18 | 127-30, 132-33, 134-42, 151 |
| Dental bill | $ 680.32 | 148-49 |
| TOTAL | $ 13,869.90 | |

Pay[ment] of Premium."[14] (Ex. F to Def.'s Resp. to Pl.'s Motion for Equitable Relief.) In other words, Plaintiff apparently purchased no more than 5.5 months of COBRA insurance, not the 11 she claimed. The record contains no reference to AARP coverage in any month besides May 2015.[15]

Washington argues, however, that because "[she] testified at trial that she obtained coverage[, s]he need not submit every single invoice because it can be inferred that payments were consistent each month." (Pl.'s Post-Hearing Mem. at 10.) But even if that is true, Plaintiff has not cited to any evidence in the record that she was covered by AARP and COBRA for 11 months. Washington is entitled to compensation for the cost of insurance coverage she purchased, but she must first demonstrate that she incurred the expense. *Kolovitz v. Brokers Title Ins. Co.*, No. 03 C 5468, 2004 WL 1199775, at *4 (N.D. Ill. June 1, 2004) (citing *Kossman v. Calumet County*, 800 F.2d 697, 703–04 (7th Cir.1986), *overruled on other grounds*, *Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 835–36 (7th Cir.1988)). Here, Plaintiff has established that she incurred $9,677.84[16] in health insurance costs since OSAD's coverage ended.[17]

---

[14] Notably, the billing statement in the record is for the final month that Plaintiff's COBRA coverage was active, August 2008. (Medical Bills at 165.)

[15] The May 2015 bill indicates that Plaintiff had an outstanding balance of $63.10, presumably from prior months' coverage, but the bill does not indicate the nature of the outstanding amount nor does it specify a start or end date for coverage. (Medical Bills at 170.)

[16]

| Insurance provider | Amount owed/paid | Ex. D Pg. # |
|---|---|---|
| Silverscript | 167.4 | 167-69 |
| COBRA | 9476.34 | 165 |
| AARP | 34.1 | 170 |
| TOTAL | $    9,677.84 | |

[17] If this were a standalone award, the court would reduce Washington's recovery by the amount she would have expected to pay in premiums for coverage under OSAD's group insurance policy during the same time period. But such an adjustment is not necessary here, as the anticipated cost of OSAD's insurance coverage will be accounted for in Plaintiff's back pay award. *See supra* at 14-15.

## CONCLUSION

For the foregoing reasons, Defendant's motion to reduce compensatory damages [144] is granted, and Plaintiff's motion for equitable relief [148] is granted in part and denied in part. The court reduces the Washington's compensatory damages award to $200,000. Plaintiff is entitled to back pay, prejudgment interest, front pay, a tax-component award, and compensation for medical expenses, all of which is yet to be determined based on additional information from the parties. Washington's requests for compensation related to pension withdrawals and personal loans are denied. Plaintiff is required to submit the following within 21 days: (1) her 2013-2015 tax returns, (2) her expected income for 2016, and (3) the amount she owes to Northwestern hospital for the treatment she received from the last day of her COBRA coverage through October 2013. OSAD, meanwhile, is required to file documentation regarding employee health insurance costs from 2008 to present within 21 days of this order. The parties are also welcome to show cause within 21 days of this order as to why the court's assumptions and calculations misrepresent what Washington would have earned from 2008 to 2015.

Finally: As is apparent from this opinion, the decision to terminate Alice Washington in February 2008 has turned out to be extraordinarily costly, and the final tally is not yet determined. Not only is the record on her claim for equitable relief still incomplete, but the court has yet to adjudicate Plaintiff's fee petition. Ms. Washington would be well served in putting this dispute behind her, and the taxpayers of Illinois can ill afford the cost of additional litigation. The parties are again urged to discuss settlement.

ENTER:

Dated: May 31, 2016

_____
REBECCA R. PALLMEYER
United States District Judge