**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALICE WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 CV 8533 |
| | ) | |
| OFFICE OF THE STATE | ) | Judge Rebecca R. Pallmeyer |
| APPELLATE DEFENDER | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alice Washington prevailed at trial on her Title VII retaliation claim against her former employer, the Office of the State Appellate Defender (OSAD). A jury awarded Plaintiff $400,000, but in a previous order [184] the court reduced that award to $200,000 pursuant to the compensatory damages cap of Title VII. 42 U.S.C. § 1981a(b)(3). That order also dealt with the issue of equitable relief. In it, the court made several findings, but determined that additional information was necessary in order to issue a final award. Having received that information from the parties, the court returns to the calculation of equitable relief. Washington has also moved for fees and costs [161], which the court addresses below.

## I.    Back Pay

In its May 31, 2016 opinion, the court determined that Plaintiff is entitled to back pay from the time of her forced resignation on March 15, 2008 through April 15, 2011, when her unit was disbanded by OSAD (May 31, 2016 Op. at 9-12), and also from mid-July 2011 through the verdict on November 18, 2015 (*id.* at 14). Prior to April 2011, Plaintiff would have been paid as an investigator; thereafter, she would have worked as a docket clerk. Over this period, Washington would have earned $372,340.49.[1] (Ex. B to [186].) But the court's back-pay

_____
[1]    In its May 31, 2016 opinion, the court concluded that Washington's earnings

calculations do not end there.  First, Plaintiff had a duty to mitigate her damages, and her potential earnings at OSAD must be reduced by her actual earnings over the same period. *Gaffney v. Riverboat Servs.*, 451 F.3d 424, 462 (7th Cir. 2006).  She also would have paid medical insurance premiums while at OSAD, the cost of which must be deducted from her back pay.  *See Gracia v. Sigmatron Int'l, Inc.*, 130 F. Supp. 3d 1249, 1258 (N.D. Ill. 2015) ("Back pay is 'the difference between actual earnings for the period and those which she would have earned absent the discrimination by defendant.'" (quoting *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985)).  She is also entitled to prejudgment interest, *see Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 757 (7th Cir. 2002), and a tax-component award to offset the increased tax burden that will result from the lump-sum payment of her back pay.  *See E.E.O.C. v. N. Star Hospitality, Inc.*, 777 F.3d 898, 904 (7th Cir. 2015) ("Put simply, without the tax-component award, [a plaintiff] will not be made whole, a result that offends Title VII's remedial scheme.").

### A.  Washington is entitled to back pay through the date of the verdict

Before turning to that math, however, the court pauses to address OSAD's renewed argument that Plaintiff is not entitled to any back pay beyond April 15, 2011, when her unit was closed and her previous position eliminated.  (Def.'s Resp. to Damages Calculations [186], hereinafter "Def.'s Resp.," at 4.)  OSAD objects to the court's ruling on two grounds:  First, Defendant argues that

---

would have totaled $377,569.  (May 31, 2016 Op. at 14.)  That figure was based on a series of assumptions the court made in the absence of hard data on docket clerk salaries from 2011 to 2015.  At the court's request, OSAD has now filed the pay scale for docket clerks during the relevant period (Ex. B to [186]), and the court has updated its calculations accordingly.  The court's back-pay total ($372,340.49) differs from OSAD's ($371,214.47), however, because OSAD's calculations contained errors.  For instance, OSAD contends that Washington would have earned $8,243.84 in the last two months of 2008.  (Ex. B to [186].)  During that period, she was earning an annual salary of $51,500.  But OSAD's figure is based on the notion that November and December constituted 16.44% of 2008.  (*Id.*)  In reality, the final 61 days of 2008, a leap year, made up 16.67% of that year (61/366 days).  Washington therefore earned $8,358.33 (16.67% x $51,500).  This error is confounding, given that OSAD's chart is a duplicate of the one that the court itself was compelled to create (*compare* Ex. B *with* May 31, 2016 Op. at 14 n.7), except that OSAD incorrectly modified the "% of year" column.

the Court's reliance on *Hutchinson v. Amateur Electronic Supply, Inc.*, 42 F.3d 1037, 1044 (7th Cir. 1994) for the proposition that the burden shifts to OSAD is misplaced . . . [because] [i]n *Hutchinson* the Court was discussing the burden of proving failure to mitigate damages, not whether the employer has to establish that the plaintiff would not have rejoined its employment in some capacity. Here, Plaintiff's mitigation of damages is not at issue, but rather whether Plaintiff has proved she would have remained employed at OSAD after April 15, 2011 . . . .

(*Id.* at 4.)  But OSAD misconstrues the court's ruling.  As OSAD correctly points out, the burden was initially on Washington to "demonstrate that defendants' misconduct caused her to lose all the wages she claims as back pay." (*Id.* at 2 (quoting *Gaddy v. Abex Corp.*, 884 F.2d 312, 320 (7th Cir. 1989)).)  But where the plaintiff "establish[es] the amount of her damages she claims resulted from the employer's conduct, [she] shift[s] to the employer the burden of going forward to show that the damages were in fact less than plaintiff asserts." *Gaddy*, 884 F.2d at 318.  As noted in the court's previous opinion, this issue was a close one, but Washington did enough to shift the burden here.  (May 31, 2016 Op. at 12.)

OSAD disagrees.  It argues that her expectation of being rehired as a docket clerk is too speculative to support her back-pay claim.  For support, Defendant cites to *Waters v. Wisc. Steel Works*, 502 F.2d 1309, 1321-22 (7th Cir. 1974), but the back-pay claim in that case was far more speculative than the one currently before the court.  The plaintiff in *Waters* sought back pay not only for the job he lost with the defendant, but also for a second, unrelated job he had held while working for the defendant.  The Seventh Circuit refused to "entertain claims of such a speculative and remote nature." *Id.*  Washington's claim is meaningfully different.  She has identified comparators with similar qualifications who were rehired by OSAD after April 15, 2011, and she seeks only those wages she would have earned while working for Defendant.  Plaintiff has done enough to establish the amount of damages she claims.  OSAD, disappointingly, offered little evidence to rebut Washington's claims.  For instance, OSAD failed to present testimony or an affidavit from Plaintiff's comparators who are apparently still in OSAD's employ.  Nor did they offer any evidence from the people who had actual knowledge of the hiring process at the regional OSAD offices where the decisions to rehire Washington's comparators were

apparently made.  (Dec. 21 Tr. at 38.)  Instead, OSAD relied on the testimony of Pelletier and OSAD's CFO Tanya Janecek, neither of whom had personal knowledge of the hiring process Washington would have faced.  (*Id.*)

Second, OSAD argues that Washington would never have been rehired following the closure of her unit in April 2011 because Pelletier had a low opinion of Washington's work. (Def.'s Resp. at 5.)  According to OSAD, the "record shows that if [Washington] had applied for a position with OSAD [in April 2011], Plaintiff would not have been hired, . . . given [that] Mr. Pelletier approved all hiring decisions."  (Def.'s Resp. at 5.)  The Seventh Circuit has made clear that, even where plaintiffs are fired for unlawful reasons, performance-related problems "should not be ignored" in the court's crafting of equitable relief.  *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1057 (7th Cir. 1990).  But the fact that Pelletier would not have hired Washington is of relatively limited import, given the jury's finding that Pelletier's decision to discharge Washington was unlawfully motivated.  The reasons that Pelletier supposedly would not have rehired Washington in April 2011 are largely the same justifications he offered for firing her in 2008.  The jury heard these arguments and nonetheless determined that her forced resignation was retaliatory. Furthermore, the plaintiff in the case cited by OSAD—*Hybert*—was the subject of multiple complaints from multiple clients and management, *id.* at 1051-52, whereas here, the primary evidence cited by OSAD that is critical of Washington's performance comes from Pelletier himself.  (Def.'s Resp. at 4-5.)  Witnesses called by Plaintiff—including Stephen Richards, a former Deputy Defender at OSAD who worked with her there—were uniform in praising her work.  (Nov 17, 2016 Testimony at 10:24-10:30 a.m.)[2]

Perhaps most importantly, OSAD overstates Pelletier's role in hiring.  Pelletier testified that, if Washington had applied for a paralegal position, he "wouldn't have been making that [hiring] decision as the State Appellate Defender.  She could have applied, and the deputy of

---

[2]    As the transcript is not in the record, the court cites instead to the audio recording of the trial proceedings.

that respective office would have interviewed her. Now, I mean, indirectly ultimately I approve all hiring, but I would not have been the one that considered her." (Dec. 21 Tr. at 23.) The court stands by its previous conclusions regarding back pay.

### B.    *Mitigation of damages*

As noted, Washington's back-pay award must be reduced by the amounts she actually earned during the relevant period. *See Gaffney v. Riverboat Servs.*, 451 F.3d 424, 462 (7th Cir. 2006); *Gracia*, 130 F. Supp. 3d at 1258. Washington has now provided her income tax returns for the years 2008 through 2015. (Ex. A to [185].) According to these records, Plaintiff earned $150,653.89 from the date she left OSAD's payroll in March 2008 through the verdict in this case.[3]

Washington's back pay award must also reflect the costs she would have incurred for health and life insurance premiums while at OSAD. Defendant has provided information regarding the premiums Plaintiff would have paid had she remained at OSAD. The court adopts these numbers, with two minor modifications. First, OSAD's calculations start after Washington's COBRA coverage ceased in August 2008, but for purposes of this analysis, the fact that Plaintiff was covered via COBRA is irrelevant. Those costs are accounted for later in this opinion, and they have no bearing on what Plaintiff would have paid for insurance as an OSAD employee. Second, OSAD fails to account for the time that Washington would not have been on OSAD payroll (e.g., April 15, 2011 to July 15, 2011). Assuming that Washington would

---

[3]    OSAD previously argued—and Plaintiff did not object—that Washington earned $112,551.90 from March 2008 through April 15, 2011. (Def.'s Resp. to Pl.'s Mot. for Equitable Relief [155] at 9.) In reaching this figure, OSAD apparently assumed that Plaintiff's 2011 income was evenly distributed across the year, meaning that she made $5,325.03 of the $18,510.82 she earned in 2011 prior to April 15, and $13,185.79 after. She also made $24,916.20 in 2012 and $0 from 2013 through the verdict, for a total of $38,101.99 between April 15, 2011 and the verdict. All told, Plaintiff earned $150,653.89 from the date she left OSAD's payroll to the verdict in this case.

not have paid insurance premiums during these months, she would have paid a total of $33,223.29.[4]

Subtracting what Washington would have paid in insurance premiums at OSAD ($33,223.29) plus Washington's actual earnings during the back-pay period ($150,653.89) from what Washington would have earned at OSAD ($372,340.49), yields Washington's ultimate back-pay award: $188,463.31.

### C.    Prejudgment interest

Washington is entitled to prejudgment interest on her back-pay award. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 757 (7th Cir. 2002). Washington asks the court to calculate prejudgment interest based on what Washington would have earned at OSAD, but such a calculation would lead to a windfall for Plaintiff. As noted, Washington had a duty to mitigate her damages and earned significant income in the years after she was forced to resign. Interest should accrue only on the back-pay amount that exceeds her actual earnings and the amount that would have been deducted from her salary for insurance premiums (i.e., $188,463.31).

For the reasons stated in the court's previous opinion, interest will be awarded at 3.4172% APR, compounding monthly. (May 31, 2016 Op. at 15-16.) The court again assumes that all of her earnings are divided equally across each year. Based on these assumptions, Washington is owed $23,807.92 in interest.[5]

---

[4]

| Rate begin | Rate end | Monthly cost | Months worked | Total |
|---|---|---|---|---|
| 3/15/2008 | 12/31/2008 | $  315.56 | 9.5 | $  2,997.82 |
| 1/1/2009 | 6/30/2009 | $  329.52 | 6 | $  1,977.12 |
| 7/1/2009 | 6/30/2010 | $  341.52 | 12 | $  4,098.24 |
| 7/1/2010 | 6/30/2011 | $  341.52 | 9.5 | $  3,244.44 |
| 7/1/2011 | 6/30/2012 | $  341.70 | 11.5 | $  3,929.55 |
| 7/1/2012 | 6/30/2013 | $  341.70 | 12 | $  4,100.40 |
| 7/1/2013 | 6/30/2014 | $  450.20 | 12 | $  5,402.40 |
| 7/1/2014 | 6/30/2015 | $  450.20 | 12 | $  5,402.40 |
| 7/1/2015 | 11/30/2015 | $  450.20 | 4.6 | $  2,070.92 |
|  |  |  | Total: | $ 33,223.29 |

[5]    These calculations are attached to this opinion as Appendix 1.

### D.     Tax offset

The final piece of the back-pay puzzle is a tax-component award designed to offset the increased tax burden Washington will face as a result of receiving her back pay in a lump sum. In order to make Plaintiff whole, the court must consider two tax-related factors: (1) how much more in taxes would Plaintiff have paid from 2008-2015 had she remained at OSAD; and (2) how much more will she pay in 2016 as a result of her lump-sum award?

Plaintiff has endeavored to answer both of these questions in a letter from CPA Alan Schimmel. (Ex. B to [192].) Using the assumptions regarding Washington's back pay outlined in the court's May 31 2016 opinion, Schimmel concluded that Washington would have paid an additional $31,492 in taxes during the relevant period. (*Id.*) Schimmel's analysis is sound, but his inputs are outdated now that OSAD has provided the actual 2012-2015 pay scale for docket clerks. The impact of these changes is minor—Washington would have earned approximately $5,000 less than Schimmel assumed over the course of eight years—but the court has modified Schimmel's analysis to reflect the difference. In doing so, the court assumes that Washington's effective tax rate remains what Schimmel calculated for each year. This assumption is reasonable because the income difference for each year is less than $1,400. Applying these tax rates to the updated 2008-2015 pay scales, Washington would have paid $30,984.57 more in taxes had Pelletier not unlawfully forced her to resign.[6]

A similar issue plagues Schimmel's analysis of Washington's increased 2016 tax burden. Schimmel assumed that Plaintiff would receive a back-pay award of $377,569, ignoring

---

[6]

| Year | Salary | Effective tax rate | Taxes owed |
|------|--------|--------------------|------------|
| 2008 | $ 39,402.05 | 15% | $ 5,874.00 |
| 2009 | $ 50,930.00 | 5% | $ 2,694.00 |
| 2010 | $ 51,710.00 | 4% | $ 2,181.00 |
| 2011 | $ 37,088.38 | 1% | $    545.86 |
| 2012 | $ 48,270.00 | 6% | $ 2,735.45 |
| 2013 | $ 49,217.12 | 12% | $ 5,812.09 |
| 2014 | $ 50,413.56 | 12% | $ 5,957.36 |
| 2015 | $ 45,309.37 | 11% | $ 5,184.81 |
|  |  | **Total:** | $30,984.57 |

the mitigating effect of Washington's actual earnings and insurance premiums from 2008-2015. As noted above, Washington is actually owed $188,463.31 in back pay. Based on the projected tax brackets for 2016, *Projected U.S. Tax Rates for 2016*, IRS, https://www.irs.com/articles/projected-us-tax-rates-2016 (last visited September 15, 2016), Plaintiff and her husband will owe $49,057.75 in federal income tax if, as in previous years, they file a joint return. She otherwise claims they would owe nothing. (Ex. B to [192].) Plaintiff will be awarded $18,073.28 ($49,057.75 – $30,984.47) to account for her modified tax liability.

## 2. Front pay

In its initial order, the court awarded Plaintiff front pay through May 27, 2023. On that date, Washington will turn 66, the current Social Security retirement age. Defendant raised only one objection to front pay in its briefing prior to the court's May 31, 2016 opinion: namely, that Plaintiff "cannot have expected to work at OSAD past April 15, 2011 . . . [because] all investigator positions . . . were eliminated on [that date]." (Def.'s Resp. to Pl.'s Mot. for Equitable Relief at 9-10.) The court rejected that argument, noting its surprise that Defendant had not argued that awarding Washington front pay would be "'unduly speculative,' . . . or that Washington has a 'reasonable prospect of obtaining comparable employment.'" (May 31, 2016 Op. at 17 (internal citations omitted).) Defendant's most recent brief returns to the merits of Plaintiff's front-pay claim, but OSAD again fails to raise any new justification for denying Plaintiff's award, instead simply re-asserting that Washington should not receive front pay because she would not have been rehired in April 2011. For the reasons discussed above regarding back pay, the court is not persuaded that Plaintiff's tenure at OSAD would have ended in April 2011. Plaintiff is entitled to front pay.

Turning to the calculation of Plaintiff's front-pay award, OSAD has supplied the court with salary data for docket clerks from 2011 through 2015. (Ex. B. to [186].) Without any evidence related to docket clerk salaries going forward, the court will assume that the docket clerk pay scale will follow the same trend as in recent years: (a) an annual raise of $780 on the

first of the year; and (b) an annual "pay-plan adjustment" of $125 per year on September 1.[7]

Washington's front-pay award must be reduced, however, by the amount she can be anticipated

to earn during the period (i.e., $18,423.85, her average annual income from 2009-2015). (*See*

May 31, 2016 Op. at 18.) Based on these calculations, Plaintiff is entitled to $274,852.73 in

front pay.[8]

### 3. Medical expenses and insurance premiums

Washington also seeks to recover (1) out-of-pocket medical expenses she incurred

between March 2008 and the verdict that would have otherwise been covered by OSAD's health

insurance; and (2) medical insurance premiums that she paid during that period.

#### A. *Out-of-pocket medical expenses*

Plaintiff's medical expenses from 2008 to 2015 can be divided into two categories:

cancer treatment Washington received, and other miscellaneous care that she and her family

members received. The court previously determined that Washington incurred $13,869.90 in

costs associated with non-cancer-related treatment between 2008 and 2015. (May 31, 2016

Op. at 21.) She would have paid 20% of these bills, with her insurance picking up the remaining

---

[7] Docket clerks at OSAD received two pay-plan adjustments between 2011 and 2015, totaling $750. (Ex. B. to [186].) The average annual pay-plan adjustment for that six-year period was $125.

[8]

| Start date | End date | OSAD salary | Expected earnings | Difference | % of year | Front pay |
|---|---|---|---|---|---|---|
| 11/18/2015 | 12/31/2015 | $ 51,360 | $ 18,423.85 | $32,936.15 | 12.02% | $ 3,959.54 |
| 1/1/2016 | 8/31/2016 | $ 52,140 | $ 18,423.85 | $33,716.15 | 66.67% | $ 22,477.43 |
| 9/1/2016 | 12/31/2016 | $ 52,265 | $ 18,423.85 | $33,841.15 | 33.33% | $ 11,280.38 |
| 1/1/2017 | 8/31/2017 | $ 53,045 | $ 18,423.85 | $34,621.15 | 66.39% | $ 22,986.17 |
| 9/1/2017 | 12/31/2017 | $ 53,170 | $ 18,423.85 | $34,746.15 | 33.33% | $ 11,582.05 |
| 1/1/2018 | 8/31/2018 | $ 53,950 | $ 18,423.85 | $35,526.15 | 66.39% | $ 23,587.03 |
| 9/1/2018 | 12/31/2018 | $ 54,075 | $ 18,423.85 | $35,651.15 | 33.33% | $ 11,883.72 |
| 1/1/2019 | 8/31/2019 | $ 54,855 | $ 18,423.85 | $36,431.15 | 66.39% | $ 24,187.89 |
| 9/1/2019 | 12/31/2019 | $ 54,980 | $ 18,423.85 | $36,556.15 | 33.33% | $ 12,185.38 |
| 1/1/2020 | 8/31/2020 | $ 55,760 | $ 18,423.85 | $37,336.15 | 66.67% | $ 24,890.77 |
| 9/1/2020 | 12/31/2020 | $ 55,885 | $ 18,423.85 | $37,461.15 | 33.33% | $ 12,487.05 |
| 1/1/2021 | 8/31/2021 | $ 56,665 | $ 18,423.85 | $38,241.15 | 66.39% | $ 25,389.62 |
| 9/1/2021 | 12/31/2021 | $ 56,790 | $ 18,423.85 | $38,366.15 | 33.33% | $ 12,788.72 |
| 1/1/2022 | 8/31/2022 | $ 57,570 | $ 18,423.85 | $39,146.15 | 66.39% | $ 25,990.48 |
| 9/1/2022 | 12/31/2022 | $ 57,695 | $ 18,423.85 | $39,271.15 | 33.33% | $ 13,090.38 |
| 1/1/2023 | 5/27/2023 | $ 58,475 | $ 18,423.85 | $40,051.15 | 40.16% | $ 16,086.12 |
| | | | | | Total: | $274,852.73 |

80%. (Nov. 23 Tr. at 12.) She is therefore entitled to an award of $11,095.92 for these expenses.

The court also concluded that OSAD must compensate Plaintiff for the cost of the cancer treatment that Northwestern Medical Center provided her without compensation. Had OSAD not unlawfully fired Washington, she would have been insured and her care covered by OSAD's health insurance. (May 31, 2016 Op. at 18-20.) "Northwestern's failure to issue a bill to an unemployed and apparently indigent person does not, in the court's view, justify excusing OSAD from paying all of the costs associated with Plaintiff's unlawful discriminatory termination." (*Id.* at 20.) OSAD objects that the court's decision is "contrary to the law," and "without precedent." (Def.'s Resp. to Court's Damages Calculations at 7-8.) But the court "has broad discretion under . . . Title VII to order equitable relief as the court deems appropriate." *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1369 n.1 (7th Cir. 1992). And although the Seventh Circuit has advised that plaintiffs should recover only those medical expenses they have incurred, *see Kossman v. Calumet County*, 800 F.2d 697, 703-04 (7th Cir. 1986), the court's remedy does not run afoul of this guidance for two reasons: (1) the remedy here will flow through Plaintiff to her medical care provider for services she has not paid for; and (2) Washington testified that the amount of her care is still "owed" to Northwestern (Dec. 21 Tr. [170] at 48). The only reason the hospital has not attempted to collect on Plaintiff's bills thus far is the fact that Washington has been unable to pay them. Now that Plaintiff is set to receive a sizable award in this case, the hospital may be entitled to seek recover of the owed funds.

The court was previously unable to determine the true cost of Washington's cancer treatment based on the records then available. The invoices filed by Washington were subject to numerous "adjustments," such that the actual cost of her medical care was indecipherable. Pursuant to the court's order, Washington has provided additional information from Northwestern, which indicates that it would have billed her for care in the amount of $65,160.38. (*See* Invoices, Ex. E to Pl.'s Add'l Evidence [185]; Summary of Charges, Ex. G to Pl.'s Add'l

Evidence.)  OSAD insurance would have covered 80% of that bill, or $52,128.30.  As noted in the court's previous opinion, reimbursement of these medical expenses will ultimately flow to Northwestern, not to Plaintiff herself.  (May 31, 2016 Op. at 20.)  Upon execution of the judgment in her case, the court expects Plaintiff to confirm that she has paid these amounts to her provider.

### B.    Insurance premiums

Washington seeks to recover insurance premiums she was forced to pay following her resignation from OSAD.  The court previously awarded $9,677.84 to compensate for premiums she paid to COBRA, AARP MedicareComplete, and a Silverscript Medicare Part D plan.  (May 31, 2016 Op. at 22.)  Plaintiff failed to prove, however, that she had incurred $18,600 she claimed to have spent on life insurance.  Washington has now provided her purported life-insurance records, but these receipts total $26,429.87, not $18,600.  (Ex. H to [185].)  Plaintiff does not explain the discrepancy.  The receipts come from three providers.  First, $18,241.00 from Aetna, for premiums from August 1, 2009 through January 31, 2013.  But the letter containing this information does not indicate what type of insurance Washington purchased from Aetna, and the letter is dated April 3, 2015, indicating that it was not gathered in response to the court's May 31, 2016 opinion.  A second letter, from State Farm Insurance, summarizes premiums paid on a life insurance policy covering Washington's husband.  These premiums are not recoverable, however, as the court is not aware of any evidence that Nathaniel Washington would have been eligible for life insurance through OSAD.  The final receipt is from AARP.  It shows that Washington paid $3,945.67 in premiums for $20,000 of term life insurance from December 2009 through the verdict.  This coverage is comparable to the insurance Washington previously received while at OSAD: for $16 per month,[9] she was covered in an amount equal to her annual salary.  (Ex.  A to [186] at 2, 6.)

---

[9]    These premiums are included in the court's back-pay calculations.  (*See supra* at 6 n.4.)

Washington has established that she incurred $3,945.67 in life insurance premiums in addition to the $9,677.84 previously awarded, for a total of $13,623.51 in premiums.

**4.      Attorney's fees and costs**

Finally, the court turns to Plaintiff's motion for fees and costs [161].  Washington seeks $305,366 in attorneys' fees—$265,536 via a lodestar calculation, plus a 15% upward adjustment based on *Hensley v. Eckerhart*, 461 U.S. 424 (1983)—and $3,245.56 in costs.  (Pl.'s Fee Pet. at 1-2.)  Defendant objects on several grounds.  OSAD argues (1) that certain attorney time entries involve paralegal and clerical work that should not be compensated at attorney rates; (2) that the attorney hourly rates proposed by Plaintiff are excessive; (3) that an upward adjustment of the lodestar is not justified here; and (4) that Plaintiff has failed to support her claim for costs.  (Def.'s Resp. to Pl.'s Fee Pet. [171], hereinafter "Def.'s Fee Resp.," at 1-9.)

Based on these objections, OSAD contends that Washington is entitled to $173,609.00. (*Id.* at 1.)  The court will deal with each objection in turn.

**A.      Hours worked**

***1.      Paralegal work***

OSAD has identified 12.1 hours of work that it claims should be compensated at a paralegal rate of $100 per hour rather than at an attorney rate:

| Individual | Date | Task | Duration |
|---|---|---|---|
| John Moran | 03.05.13 | Filing documentations | 2.0 |
|  |  | *SUB TOTAL:* | *2.0* |
| Jawayria | 08.07.14 | Filed appearance | 0.3 |
| Kalimullah | 08.25.14 | Prepared MSJ response for binding | 1.0 |
|  | 09.18.15 | Filed pre-trial order | 0.4 |
|  | 11.13.15 | Prepared exhibits for trial | 0.2 |
|  | 11.13.15 | Prepared demonstrative exhibits for trial | 0.1 |
|  |  | *SUB TOTAL:* | *2.0* |
| Matthew | 1.24.13 | Prepared and filed appearances | 0.5 |
| Layman | 11.19.13 | Reviewed, indexed, and stamped Plaintiff's production | 7.0 |
|  | 02.28.14 | Filed motion to withdraw | 0.6 |
|  |  | *SUB TOTAL:* | *8.1* |
|  |  | **TOTAL:** | **12.1** |

(Ex. B to *Id.*)  For support, Defendant points to several cases, including *Blackwell v. Kalinowski*, No. 08 C 7257, 2012 WL 469962, at *7 (N.D. Ill. Feb. 13, 2012).   In *Blackwell*, the court determined that several time entries charged at attorney rates "should have been delegated to a

paralegal," such as the preparation and filing of appearances. *Id.* Plaintiff's only reply to the holding in *Blackwell* is that "*Blackwel v. Kalinowskil* [sic], is not properly cited and as such, Washington was unable to locate it." (Pl.'s Reply at 1-2.) The court is troubled by Plaintiff's effort. Defendant's citation of the case in question contains two typos: the final L in "Blackwell" has been moved to the end of "Kalinowski", and the year of decision is incorrectly identified. But these errors were apparently inadvertent, and should not have impacted Plaintiff's purported efforts to locate the case. Defendant correctly cited the Westlaw citation—2012 WL 469962— the only information relevant to locating the case in an electronic database. The court had no difficulty locating the case, and Plaintiff should have been able to do the same.

More importantly, *Blackwell* is directly on point. The filing of appearances, and motions related to appearances, are tasks that should have been delegated to a paralegal. The 3.8 hours spent on these tasks (2 by Moran, 0.7 by Kalimullah, and 1.1 by Layman) will be billed at a paralegal rate of $100. *See Smith v. Altman*, No. 12 C 4546, 2015 WL 5675367, at *7 (N.D. Ill. Sept. 21, 2015) (finding a paralegal rate of $100 per hour reasonable).

Plaintiff also argues that "attorney skill" was necessary for the remaining entries on OSAD's list, which she describes as "select[ing] appropriate exhibits for trial . . . [,] creating damage analyses charts used for demonstrative purposes, [and] sorting through and indexing documents relevant to a request for production." (Pl.'s Reply at 2.) The court agrees with this sentiment, but not all of the time entries in question actually reflect the type of work to which Plaintiff refers. Layman's effort "review[ing], index[ing], and stamp[ing] Plaintiff's production," which took seven hours, required the skill and attention of an attorney. The remaining tasks did not. For instance, the entries state that Kalimullah "prepared [motion for summary judgment] response for binding," "prepared exhibits for trial," and "prepared demonstrative exhibits for trial," not that she spent this time drafting the summary judgment brief or selecting the exhibits. Furthermore, the time allotted for these tasks—e.g., six minutes preparing the exhibits for trial—

belies the notion that her work was particularly skill-intensive.  The 1.3 hours Kalimullah spent on these tasks will be billed at the paralegal rate.

### 2.    Clerical work

OSAD challenges 70.7 hours submitted for tasks performed by Nerdisa Muratagic, a legal assistant, as "purely clerical or secretarial in nature and [therefore] not compensable." (Def.'s Resp. at 3.)  In reply, Washington argues that Muratagic's "hours spent assisting with witness preparations, assisting in court, or compiling trial information and notes for counsel required paralegal skills."  (Pl.'s Reply at 3.)

"[C]lerical or secretarial tasks . . . should be absorbed as overhead into the attorneys' billing rate."  *O'Brien v. Panino's, Inc.*, No. 10 C 2991, 2011 U.S. Dist. LEXIS 91104, at *5 (N.D. Ill. Aug. 16, 2011) (citing *Spegon v. Catholic Bishop*, 175 F.3d 544, 553 (7th Cir. 1999)).  "The relevant inquiry for requested paralegal fees is 'whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the payscale ladder.'"  *Spegon*, 175 F.3d at 553 (quoting *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1315 (7th Cir. 1996)).  Other judges of this court have excluded time spent preparing and delivering documents to court, organizing files, copying documents, and ordering transcripts.  *See Blackwell*, 2009 WL 469962, at *6; *United Central Bank v. Kanan Fashions, Inc.*, No. 10 C 331, 2012 WL 1409245, at *4 (N.D. Ill. Apr. 23, 2012).

The court agrees with Washington that many of the tasks purportedly performed by Muratagic rise above the level of clerical work, particularly the assistance she provided in preparing witnesses, preparing opening and closing statements, and in court.  But these activities account for only 26.8 of the 70.7 hours allotted to her.  The remaining time involves printing, compiling notes, and visiting the federal courthouse to drop off binders and pay fees to the court reporter.  These tasks are not complex enough to justify the use of a paralegal and are therefore noncompensable.

OSAD also takes issue with numerous tasks performed by attorney Kalimullah, which it labels as "[u]ncompensable administrative work."[10] Washington defends these tasks by arguing that Kalimullah's hours "were largely spent contacting witnesses, . . . but [OSAD] fails to understand the need for rapport with a witness before trial or that discussions with witnesses included trial strategy." (Pl.'s Reply at 3.) The 1.5 hours dedicated to witness preparation and interactions with witnesses required attorney skill, but the remaining tasks are administrative and non-recoverable.

### B. Hourly rates

The reasonable hourly rate for an attorney is the market rate for her services. *See Fogle v. William Chevrolet/Geo, Inc.*, 275 F.3d 613, 615 (7th Cir. 2001). "An attorney's market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." *Spegon*, 175 F.3d at 555 (citations omitted). An attorney seeking fees has the burden of proving her market rate, but once she does, opposing counsel bears the burden of showing why the hourly rate should be lower. *Id.* at 554-55.

---

10

| Date | Task | Duration |
|------|------|----------|
| 04.07.15 | Contacted witnesses to discuss availability | 0.4 |
| 04.08.15 | Email witness about new trial date | 0.3 |
| 11.04.15 | Prepared Pre-trial Binder for Judge Pallmeyer (Same time entry and task submitted by Ms. Muratagic) | 1.0 |
| 11.09.15 | Called Court to set-up technology training | 0.1 |
| 11.09.15 | Emailed Court reporter to order transcripts | 0.1 |
| 11.10.15 | Called possible witness to confirm availability | 0.1 |
| 11.11.15 | Emailed Doctor about trial prep. | 0.1 |
| 11.11.16 | Called Doctor about trial prep. | 0.1 |
| 11.11.17 | Located alternative contact info for witness | 0.1 |
| 11.12.15 | Printed and labeled materials, exhibits, and binders for trial (Same time entry and task submitted by Ms. Muratagic) | 2.5 |
| 11.12.16 | Called Doctor about trial prep. | 0.3 |
| 11.12.17 | Called about witness testimony time | 0.1 |
| 11.13.15 | Spoke with Courtroom deputy about witness testimony time | 0.1 |
| 11.13.16 | Called witness about trial prep | 0.1 |
| 11.14.15 | Went to Kinko's to order calendar exhibit | 0.7 |
| 11.15.15 | Picked up exhibit from Kinko's | 0.3 |
| 11.30.15 | Placed transcript order | 0.1 |
| 12.03.15 | Emailed Court Reporter about transcript order | 0.1 |
| 12.04.15 | Emailed Court Reporter about transcript order | 0.1 |
| 12.11.15 | Emailed Court Reporter about transcript order | 0.1 |
| | **TOTAL:** | 6.8 |

(Ex. B to [171].)

Plaintiff claims the following market rates: John Moran (admitted in 1969), $600; Christopher Keleher (admitted in 2002), $460; Jawayria Kalimullah (admitted in 2013), $300; Matthew Layman (admitted in 2007), $300. (Pl.'s Fee Mot. at 10.) OSAD urges that the attorney billing rates used by Plaintiff were excessive, arguing that Moran's hourly rate should instead be $425, Keleher's should be $385, and Kalimullah's should be $175. Defendant also asks the court to disallow Layman's time entirely, because "no evidence has been produce [sic] to try to support [his] requested rate." (Def.'s Fee Resp. at 5.)

In support of her attorneys' proposed hourly rates, Washington points to similar rates used by other courts to compensate attorneys with similar experience. *See, e.g.*, *Entm't Software Ass'n v. Blagojevich*, No. 05 C 4265, 2006 WL 3694851, at *2 (N.D. Ill. Aug. 9, 2006) (awarding hourly rate of $585 to attorney with 27 years of experience, $425 to attorney with 10 years of experience, and $340 to an attorney with 6 years of experience). With regard to Moran, Plaintiff also filed declarations from David Lee (admitted in 1977) and Aaron Maduff (admitted in 1995), employment and civil rights attorneys in the Chicago market. (Exs. G & H to [161].) Each of Washington's attorneys also submitted an affidavit or declaration of their own. Lee and Maduff stated that their own hourly rates are comparable to what Moran seeks here ($595 for Lee, and $675 for Maduff). They also opined that Moran's $600 hourly rate is actually below the market rate for his services. OSAD argues that these declarations are of limited persuasive weight, however, because "neither attorney has identified specific rates awarded to other civil rights attorneys of comparable experience within the relevant community." (Def.'s Fee Resp. at 4 (citing *Montanez v. Chi. Police Officers*, 931 F. Supp. 2d 869, 878 (N.D. Ill. 2013)).) Be that as it may, Washington has provided far more evidence in favor of her proposed rates than has OSAD. With regard to Moran, for example, OSAD's only source of support for its argument in favor of a $425 hourly rate is a case in which the court held that such a rate is appropriate for attorneys with "twenty-plus years' experience." (Def.'s Fee Resp. at 4 (citing *Smith* 2015 WL 5675376, at *3-5).)

Washington's support for Keleher's hourly rate is less robust—it consists largely of affidavits from Moran and Keleher—but the proposed rate of $460 is notably equal to the applicable rate in the Laffey Matrix.[11] (*See* Ex. J to [161].) Just as it did for Moran, OSAD cites to a single case in support of its proposed rate of $385 for Keleher. (*Id.* at 5 (citing *Montanez*, 931 F. Supp. 2d at 877-78).) Washington has presented evidence sufficient to establish that Moran's and Keleher's rates are reasonable. In light of Plaintiff's evidence that the rates charged are in line with the market, the court approves both of the attorneys' proposed hourly rates.

Kalimullah and Layman present more difficult questions. As an initial matter, the court notes the apparent incongruity of charging the same rate for an attorney admitted to the bar for less than three years (Kalimullah) and one admitted nearly a decade ago (Layman). With regard to Kalimullah's proposed rate of $300, Washington argues that Kalimullah has experience beyond her years. (*See* Kalimullah Aff., Ex. I to [161], ¶ 10.) But neither the cases cited by Plaintiff nor the Laffey Matrix support the notion that the $300 per hour is a reasonable rate for an attorney with Kalimullah's experience. OSAD recommends a $175 rate, again based on the use of that rate in a single case. (*See* Def.'s Fee Resp. at 5 (citing *Montanez*, 931 F. Supp. 2d at 878-89.) But this rate is significantly less than the Laffey Matrix. Given the lack of evidence provided by either part regarding the market rate for attorneys of Kalimullah's tenure, the court adopts the Laffey Matrix's rate of $255 for her hourly rate.

Finally, the court turns to Matthew Layman, Washington's prior counsel. OSAD objected to the award of any fees for Layman's efforts due to the "absence of any information about Mr.

---

[11] The Laffey Matrix is a chart of hourly rates for attorneys and paralegals in the Washington, D.C. area that was prepared by the United States Attorney's Office for the District of Columbia to be used in fee-shifting cases. *See Warfield v. City of Chicago*, 733 F. Supp. 2d 950, 960 n.11 (N.D. Ill. 2010). Although the Seventh Circuit has observed the mixed opinion within the legal community regarding the utility of the Laffey Matrix, *see Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011), courts in this district have considered it as a factor in determining the reasonableness of hourly rates sought. *See Handott v. City of Chi.*, No. 07 C 6754, 2010 U.S. Dist. LEXIS 35548, at *22-23 (N.D. Ill. Apr. 12, 2010) (citing cases).

Layman or his experience" in Plaintiff's fee petition. (Def.'s Fee Resp. at 5.) But Washington attached an affidavit from Layman as an exhibit to her reply brief. (Ex. 1 to [178].) In it, Layman states that he has been a member of the bar since 2007, and he points the court to a recent case in which the Cook County Circuit Court awarded him fees at a rate of $325 per hour (*Sara Meegan v. Florence Gonzales*, No. 2009 L 009898). This evidence, plus the fact that Layman's proposed rate ($300) is less than what the Laffey Matrix suggests for attorneys with nine years of experience ($370), is sufficient to establish that Layman's rate is reasonable and in line with market rates.

Using these rates, the court's lodestar calculation yields a total fee of $251,532.[12]

## C.    Upward adjustment under *Hensley*

The lodestar calculation does not end the court's analysis, however. The court may, in its discretion, increase or decrease the lodestar amount by considering additional factors identified by the Court in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). Washington seeks a 15% increase to the lodestar, based on six of the *Hensley* factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the experience, reputation, and ability of the attorneys; (5) the amount involved and results obtained; and (6) the "undesirability" of the case." (Pl.'s Fee Pet. at 12.) More specifically, Washington argues that her case was "exceptional" because the government refused to discuss settlement, the government "sprang" novel theories at trial, and the case resulted in an "incalculable . . . social benefit." (*Id.*) Although the court has repeatedly encouraged OSAD to consider settlement, the additional work created by defendant's

---

[12]

| Name | Hours | Rate | Total |
|------|-------|------|-------|
| John Moran | 107.7 | $600 | $64,620 |
| Christopher Keleher | 238.4 | $460 | $109,664 |
| Kawayria Kalimullah | 195.6 | $255 | $49,878 |
| Matthew Layman | 82.3 | $300 | $24,690 |
| Nerdisa Muratagic | 26.8 | $100 | $2,680 |
| | | TOTAL: | $251,532 |

recalcitrance and any developments at trial are already factored into the lodestar calculation. As for the social benefit of the case, Washington points the court to *Riverside v. Rivera*, 477 U.S. 561 (1986), in which the Court held that "[r]egardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards." As the language quoted by Washington makes clear, this factor is meant to discourage courts from denying fee petitions in cases where plaintiffs' attorneys seek to recover fees significantly in excess of any monetary award recovered by their clients. In *Rivera* itself, for instance, the jury awarded plaintiffs $33,350 and their attorneys sought $245,456.25 in fees. By contrast, the jury in this case awarded Washington $400,000 in compensatory damages (later reduced to the statutory cap of $200,000). The lodestar adequately compensates Washington's attorneys in this case. No adjustment is warranted.

### D. Costs

Washington seeks $3,245.56 in costs. (Ex. 6 to [161].) OSAD objects, arguing that the court should exclude $648.86 in costs incurred as part of Washington's earlier state-court litigation. Neither party cites to any caselaw for support, but this court has held that state-court costs are recoverable where the "action in federal court and the earlier suit in state court are, in essence, the same proceeding." *Coal. for Political Honesty v. Ill. St. Bd. of Elections*, No. 81 C 2718, 1983 U.S. Dist. LEXIS 14457, at *3-4 (N.D. Ill. Aug. 19, 1983). Plaintiff was not required to pursue her claim in state court before filing suit in this court. The cases are predicated on the same facts and press the similar claims, but they are not essentially the same proceeding. Washington is awarded $2,596.60 for those fees related to this suit.

### CONCLUSION

For the reasons discussed above and in the court's May 31, 2016 opinion, Washington is entitled to $200,000 in compensatory damages as well $613,029.44 in equitable relief: (1) $188,463.31 in back pay; (2) $49,057.75 to offset her increased tax burden; (3) $23,807.92 in

prejudgment interest; (4) $274,852.73 in front pay; (5) $13,623.51 in medical insurance premiums; and (5) $63,224.22 in medical expenses, $52,128.30 of which she must pass on to Northwestern Medical Center. Washington is also entitled to $251,532 in fees and $2,596.60 in costs.

ENTER:

Dated: September 22, 2016

_____
REBECCA R. PALLMEYER
United States District Judge

# Appendix 1

| Month | % worked | Annual rate | Back pay earned | Actual earnings | Insurance rate | Insurance owed | Difference | With interest |
|---|---|---|---|---|---|---|---|---|
| March 2008 | 52% | $ 49,400 | $ 2,159.56 | $ 1,141.42 | $ 315.56 | $ 162.87 | $ 855.28 | $ 1,106.58 |
| April 2008 | 100% | $ 49,400 | $ 4,049.18 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,450.79 | $ 1,871.82 |
| May 2008 | 100% | $ 49,400 | $ 4,184.15 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,585.76 | $ 2,040.25 |
| June 2008 | 100% | $ 49,400 | $ 4,049.18 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,450.79 | $ 1,861.37 |
| July 2008 | 100% | $ 49,400 | $ 4,184.15 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,585.76 | $ 2,028.85 |
| Aug. 2008 | 100% | $ 49,400 | $ 4,184.15 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,585.76 | $ 2,023.18 |
| Sept. 2008 | 100% | $ 49,400 | $ 4,049.18 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,450.79 | $ 1,845.80 |
| Oct. 2008 | 100% | $ 49,400 | $ 4,184.15 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,585.76 | $ 2,011.88 |
| Nov. 2008 | 100% | $ 50,150 | $ 4,110.66 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,512.26 | $ 1,913.27 |
| Dec. 2008 | 100% | $ 50,150 | $ 4,247.68 | $ 2,282.83 | $ 315.56 | $ 315.56 | $ 1,649.28 | $ 2,080.79 |
| Jan. 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 329.52 | $ 329.52 | $ (136.53) | $ - |
| Feb. 2009 | 100% | $ 50,930 | $ 3,906.96 | $ 4,132.57 | $ 329.52 | $ 329.52 | $ (555.13) | $ - |
| March 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 329.52 | $ 329.52 | $ (136.53) | $ - |
| April 2009 | 100% | $ 50,930 | $ 4,186.03 | $ 4,132.57 | $ 329.52 | $ 329.52 | $ (276.06) | $ - |
| May 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 329.52 | $ 329.52 | $ (136.53) | $ - |
| June 2009 | 100% | $ 50,930 | $ 4,186.03 | $ 4,132.57 | $ 329.52 | $ 329.52 | $ (276.06) | $ - |
| July 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 341.52 | $ 341.52 | $ (148.53) | $ - |
| Aug. 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 341.52 | $ 341.52 | $ (148.53) | $ - |
| Sept. 2009 | 100% | $ 50,930 | $ 4,186.03 | $ 4,132.57 | $ 341.52 | $ 341.52 | $ (288.06) | $ - |
| Oct. 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 341.52 | $ 341.52 | $ (148.53) | $ - |
| Nov. 2009 | 100% | $ 50,930 | $ 4,186.03 | $ 4,132.57 | $ 341.52 | $ 341.52 | $ (288.06) | $ - |
| Dec. 2009 | 100% | $ 50,930 | $ 4,325.56 | $ 4,132.57 | $ 341.52 | $ 341.52 | $ (148.53) | $ - |
| Jan. 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,282.87 |
| Feb. 2010 | 100% | $ 51,710 | $ 3,966.79 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 629.52 | $ 763.69 |
| March 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,275.71 |
| April 2010 | 100% | $ 51,710 | $ 4,250.14 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 912.86 | $ 1,101.23 |
| May 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,268.58 |
| June 2010 | 100% | $ 51,710 | $ 4,250.14 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 912.86 | $ 1,095.08 |
| July 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,261.50 |
| Aug. 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,257.97 |
| Sept. 2010 | 100% | $ 51,710 | $ 4,250.14 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 912.86 | $ 1,085.92 |
| Oct. 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,250.95 |
| Nov. 2010 | 100% | $ 51,710 | $ 4,250.14 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 912.86 | $ 1,079.86 |
| Dec. 2010 | 100% | $ 51,710 | $ 4,391.81 | $ 2,995.76 | $ 341.52 | $ 341.52 | $ 1,054.53 | $ 1,243.96 |
| Jan. 2011 | 100% | $ 52,490 | $ 4,458.05 | $ 1,542.57 | $ 341.52 | $ 341.52 | $ 2,573.97 | $ 3,027.85 |
| Feb. 2011 | 100% | $ 52,490 | $ 4,026.63 | $ 1,542.57 | $ 341.52 | $ 341.52 | $ 2,142.54 | $ 2,513.30 |
| March 2011 | 100% | $ 52,490 | $ 4,458.05 | $ 1,542.57 | $ 341.52 | $ 341.52 | $ 2,573.97 | $ 3,010.94 |
| April 2011 | 50% | $ 52,490 | $ 2,157.12 | $ 1,542.57 | $ 341.52 | $ 170.76 | $ 443.79 | $ 517.69 |
| May 2011 | 0% | $ - | $ - | $ 1,542.57 | $ 341.52 | $ - | $ (1,542.57) | $ - |
| June 2011 | 0% | $ - | $ - | $ 1,542.57 | $ 341.52 | $ - | $ (1,542.57) | $ - |
| July 2011 | 52% | $ 47,490 | $ 2,081.75 | $ 1,542.57 | $ 341.70 | $ 176.36 | $ 362.82 | $ 419.69 |
| Aug. 2011 | 100% | $ 47,490 | $ 4,033.40 | $ 1,542.57 | $ 341.70 | $ 341.70 | $ 2,149.13 | $ 2,479.03 |
| Sept. 2011 | 100% | $ 47,490 | $ 3,903.29 | $ 1,542.57 | $ 341.70 | $ 341.70 | $ 2,019.02 | $ 2,322.44 |
| Oct. 2011 | 100% | $ 47,490 | $ 4,033.40 | $ 1,542.57 | $ 341.70 | $ 341.70 | $ 2,149.13 | $ 2,465.19 |
| Nov. 2011 | 100% | $ 47,490 | $ 3,903.29 | $ 1,542.57 | $ 341.70 | $ 341.70 | $ 2,019.02 | $ 2,309.47 |
| Dec. 2011 | 100% | $ 47,490 | $ 4,033.40 | $ 1,542.57 | $ 341.70 | $ 341.70 | $ 2,149.13 | $ 2,451.42 |
| Jan. 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,900.02 |
| Feb. 2012 | 100% | $ 48,270 | $ 3,824.67 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,406.62 | $ 1,595.51 |
| March 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,889.41 |
| April 2012 | 100% | $ 48,270 | $ 3,956.56 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,538.51 | $ 1,735.36 |
| May 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,878.86 |
| June 2012 | 100% | $ 48,270 | $ 3,956.56 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,538.51 | $ 1,725.67 |
| July 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,868.36 |
| Aug. 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,863.14 |
| Sept. 2012 | 100% | $ 48,270 | $ 3,956.56 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,538.51 | $ 1,711.24 |
| Oct. 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,852.73 |
| Nov. 2012 | 100% | $ 48,270 | $ 3,956.56 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,538.51 | $ 1,701.68 |
| Dec. 2012 | 100% | $ 48,270 | $ 4,088.44 | $ 2,076.35 | $ 341.70 | $ 341.70 | $ 1,670.39 | $ 1,842.39 |
| Jan. 2013 | 100% | $ 49,050 | $ 4,165.89 | $ - | $ 341.70 | $ 341.70 | $ 3,824.19 | $ 4,206.16 |
| Feb. 2013 | 100% | $ 49,050 | $ 3,762.74 | $ - | $ 341.70 | $ 341.70 | $ 3,421.04 | $ 3,752.22 |
| March 2013 | 100% | $ 49,050 | $ 4,165.89 | $ - | $ 341.70 | $ 341.70 | $ 3,824.19 | $ 4,182.67 |
| April 2013 | 100% | $ 49,050 | $ 4,031.51 | $ - | $ 341.70 | $ 341.70 | $ 3,689.81 | $ 4,024.40 |
| May 2013 | 100% | $ 49,050 | $ 4,165.89 | $ - | $ 341.70 | $ 341.70 | $ 3,824.19 | $ 4,159.31 |
| June 2013 | 100% | $ 49,050 | $ 4,031.51 | $ - | $ 341.70 | $ 341.70 | $ 3,689.81 | $ 4,001.93 |
| July 2013 | 100% | $ 49,050 | $ 4,165.89 | $ - | $ 450.20 | $ 450.20 | $ 3,715.69 | $ 4,018.73 |
| Aug. 2013 | 100% | $ 49,050 | $ 4,165.89 | $ - | $ 450.20 | $ 450.20 | $ 3,715.69 | $ 4,007.50 |
| Sept. 2013 | 100% | $ 49,550 | $ 4,072.60 | $ - | $ 450.20 | $ 450.20 | $ 3,622.40 | $ 3,895.96 |
| Oct. 2013 | 100% | $ 49,550 | $ 4,208.36 | $ - | $ 450.20 | $ 450.20 | $ 3,758.16 | $ 4,030.66 |
| Nov. 2013 | 100% | $ 49,550 | $ 4,072.60 | $ - | $ 450.20 | $ 450.20 | $ 3,622.40 | $ 3,874.20 |
| Dec. 2013 | 100% | $ 49,550 | $ 4,208.36 | $ - | $ 450.20 | $ 450.20 | $ 3,758.16 | $ 4,008.15 |
| Jan. 2014 | 100% | $ 50,330 | $ 4,274.60 | $ - | $ 450.20 | $ 450.20 | $ 3,824.40 | $ 4,067.40 |
| Feb. 2014 | 100% | $ 50,330 | $ 3,860.93 | $ - | $ 450.20 | $ 450.20 | $ 3,410.73 | $ 3,617.30 |
| March 2014 | 100% | $ 50,330 | $ 4,274.60 | $ - | $ 450.20 | $ 450.20 | $ 3,824.40 | $ 4,044.69 |
| April 2014 | 100% | $ 50,330 | $ 4,136.71 | $ - | $ 450.20 | $ 450.20 | $ 3,686.51 | $ 3,887.95 |
| May 2014 | 100% | $ 50,330 | $ 4,274.60 | $ - | $ 450.20 | $ 450.20 | $ 3,824.40 | $ 4,022.10 |
| June 2014 | 100% | $ 50,330 | $ 4,136.71 | $ - | $ 450.20 | $ 450.20 | $ 3,686.51 | $ 3,866.24 |
| July 2014 | 100% | $ 50,330 | $ 4,274.60 | $ - | $ 450.20 | $ 450.20 | $ 3,824.40 | $ 3,999.64 |
| Aug. 2014 | 100% | $ 50,330 | $ 4,274.60 | $ - | $ 450.20 | $ 450.20 | $ 3,824.40 | $ 3,988.45 |
| Sept. 2014 | 100% | $ 50,580 | $ 4,157.26 | $ - | $ 450.20 | $ 450.20 | $ 3,707.06 | $ 3,855.27 |
| Oct. 2014 | 100% | $ 50,580 | $ 4,295.84 | $ - | $ 450.20 | $ 450.20 | $ 3,845.64 | $ 3,988.20 |
| Nov. 2014 | 100% | $ 50,580 | $ 4,157.26 | $ - | $ 450.20 | $ 450.20 | $ 3,707.06 | $ 3,833.74 |
| Dec. 2014 | 100% | $ 50,580 | $ 4,295.84 | $ - | $ 450.20 | $ 450.20 | $ 3,845.64 | $ 3,965.93 |
| Jan. 2015 | 100% | $ 51,360 | $ 4,362.08 | $ - | $ 450.20 | $ 450.20 | $ 3,911.88 | $ 4,022.97 |
| Feb. 2015 | 100% | $ 51,360 | $ 3,939.95 | $ - | $ 450.20 | $ 450.20 | $ 3,489.75 | $ 3,578.81 |
| March 2015 | 100% | $ 51,360 | $ 4,362.08 | $ - | $ 450.20 | $ 450.20 | $ 3,911.88 | $ 4,000.50 |
| April 2015 | 100% | $ 51,360 | $ 4,221.37 | $ - | $ 450.20 | $ 450.20 | $ 3,771.17 | $ 3,845.82 |
| May 2015 | 100% | $ 51,360 | $ 4,362.08 | $ - | $ 450.20 | $ 450.20 | $ 3,911.88 | $ 3,978.16 |
| June 2015 | 100% | $ 51,360 | $ 4,221.37 | $ - | $ 450.20 | $ 450.20 | $ 3,771.17 | $ 3,824.34 |
| July 2015 | 100% | $ 51,360 | $ 4,362.08 | $ - | $ 450.20 | $ 450.20 | $ 3,911.88 | $ 3,955.94 |
| Aug. 2015 | 100% | $ 51,360 | $ 4,362.08 | $ - | $ 450.20 | $ 450.20 | $ 3,911.88 | $ 3,944.88 |
| Sept. 2015 | 100% | $ 51,360 | $ 4,221.37 | $ - | $ 450.20 | $ 450.20 | $ 3,771.17 | $ 3,792.35 |
| Oct. 2015 | 100% | $ 51,360 | $ 4,362.08 | $ - | $ 450.20 | $ 450.20 | $ 3,911.88 | $ 3,922.85 |
| Nov. 2015 | 60% | $ 51,360 | $ 2,532.82 | $ - | $ 450.20 | 270.12 | $ 2,262.70 | $ 2,262.70 |